

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 5, 2024

**BY ECF**
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Re:    ***United States v. Peter Khaimov,* 22 Cr. 20 (PGG)**

Dear Judge Gardephe:

 The above-referenced defendant, Peter Khaimov ("Khaimov" or the "defendant"), is scheduled to be sentenced on June 11, 2024 at 10 a.m. in Courtroom 705 following his guilty plea to one count of conspiracy to commit Travel Act bribery, in violation of Title 18, United States Code, Section 371, and one count of conspiracy to commit healthcare fraud, in violation of Title 18, United States Code, Section 371, and one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 371. The Government respectfully submits this letter in advance of sentencing.  The defendant's guidelines imprisonment range under the United States Sentencing Guidelines ("Guidelines") would be 262 to 327 months' imprisonment (the "Guidelines Range"). However, pursuant to U.S.S.G. § 5G1.1(c)(1), because the statutory maximum is 180 months' imprisonment, the maximum guidelines sentence is 180 months' imprisonment. For the reasons set forth below, the Government submits that a sentence of 180 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**A.  Offense Conduct**

**1.  Wave 1: The November 2019 Indictment**

 As the Court is aware, on November 6, 2019, the Government indicted 27 individuals in one of the largest no fault automobile insurance bribery schemes ever prosecuted. *See United States v. Rose et al.*, 19 Cr. 789 (the "Rose Indictment"). To date, all 27 defendants have pled guilty to one or more charges in the Rose Indictment.  The Rose Indictment alleged that from 2014 to November 2019, Anthony Rose, Sr. a/k/a "Todd Chambers" ("Rose") and a host of co-conspirators participated in a widespread bribery scheme to exploit insurance programs designed to protect motor vehicle accident victims under New York's no-fault insurance laws. Although similar schemes have been prosecuted before, this scheme was unique in its size, scope, and sophistication.  Ringleader Anthony Rose and other defendants bribed 911 operators, medical

personnel, and NYPD police officers for the confidential information of tens of thousands of motor vehicle accident victims. Rose then established a fully staffed "call center" to exploit this information. Rose and the other defendants at the call center contacted accident victims by using the phone numbers stolen from 911 operators and hospital records, and lied to the victims by claiming that they were calling on behalf of the State of New York. Rose and his associates then attempted to steer the accident victims to a preferred "network" of medical clinics and lawyers handpicked by Rose and the other defendants. Rose and his associates deemed these clinics and lawyers "preferred" because they paid Rose kickbacks for referrals, which Rose distributed to the other defendants.

### 2. Wave 2: The January 2022 Indictments

The Government's investigation continued after the Rose Indictment, seeking to hold responsible the individuals who organized the above-described scheme. The Government accordingly filed two additional indictments in January 2022: *United States v. Pierre et al*, 22. Cr. 19 and *United States v. Gulkarov et al.*, 22 Cr. 20. Alexander Gulkarov and Khaimov were co-leaders of the Gulkarov conspiracy.

<u>Overview of the Scheme</u>

From at least 2014 up to and including 2021, Roman Israilov, Alexander Gulkarov, Peter Khaimov (collectively, the "Clinic Controllers"), and others were members and associates of a criminal enterprise (the "Gulkarov Organization" or the "Organization") that exploited insurance programs designed to protect motor vehicle accident victims (the "No-Fault Scheme"). (Presentence Report ("PSR") ¶ 14). As part of the No-Fault Scheme, the Gulkarov Organization fraudulently owned and controlled more than a dozen medical professional corporations, including medical, acupuncture, and chiropractic practices, by paying licensed medical professionals to use their licenses to incorporate the professional corporations (collectively, the "No-Fault Clinics" or the "Clinics"). The Gulkarov Organization defrauded automobile insurance companies by billing insurance companies for unnecessary and excessive medical treatments and lying under oath to insurance company representatives. (*Id.* ¶ 15). The Gulkarov Organization further promoted the scheme through bribery. The Gulkarov Organization paid hundreds of thousands of dollars to co-conspirators (the "Runners"), who used this money to bribe 911 operators, hospital employees, and others (collectively, the "lead sources") for confidential motor vehicle accident victim information. (*Id.* ¶ 16). The Runners then used this information to contact automobile accident victims, lie to them, and induce them to seek medical treatment at, among other places, the No-Fault Clinics. (*Id.*). The Gulkarov Organization laundered the proceeds of the fraud scheme through law firms, check-cashing entities, and shell companies, and used the money to pay for luxury cars, watches, and vacations. (*Id.* ¶ 17). Then, when members of the Gulkarov Organization learned that they were under federal criminal investigation, they obstructed justice by fabricating documents, lying to law enforcement, and committing perjury before a federal grand jury. (*Id.*). Ultimately, the Gulkarov Organization billed insurance companies for more than $30 million in fraudulent medical treatments. (*Id.* ¶ 18).

<u>Overview of the No-Fault Motor Vehicle Insurance</u>

During the period charged in the indictments, New York State Law required every vehicle registered in New York State to have no-fault automobile insurance, which enabled the driver and passengers of a vehicle registered and insured in New York State to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault (the "No-Fault Law"). (*Id.* ¶ 19). The No-Fault Law required payments for medical treatments to be made promptly, thereby obviating the need for vehicle occupants (the "Patients") to file personal injury lawsuits in order to be reimbursed for medical treatment. (*Id.*). Under the No-Fault Law, the Patients could assign their right to reimbursement from an insurance company to others, including, but not limited to, medical clinics that provided medical services to treat their injuries. (*Id.*). If such an assignment were made, the medical clinics, or their agents, would bill the insurance company directly for services rendered and would receive payments directly from the insurance company. (*Id.*). Typically, insurance companies compensate medical practitioners at a fixed rate for various medical services performed on these accident victims. (*Id.*). In order to obtain damages, separate and apart from the $50,000 allowed by the No-Fault Law, a Patient could file a personal injury claim and/or lawsuit in order to show that the occupant sustained a "serious injury," as defined by New York State Law, as a result of the accident. (*Id.*).

Pursuant to New York State Law, all medical clinics in New York State must have been incorporated, owned, operated, and/or controlled by a licensed medical practitioner in order to be eligible for reimbursement under the No-Fault Law. Insurance companies could deny all billings for medical treatments from a medical clinic that was not actually owned, operated, and controlled by a licensed medical practitioner. (*Id.* ¶ 20).

<u>The Fraudulent No-Fault Clinics</u>

In order to take advantage of the patient-friendly provisions of the No-Fault Law, the Clinic Controllers, including Khaimov—who were not themselves licensed medical practitioners— recruited over half a dozen medical practitioners, including medical doctors, chiropractors, and acupuncturists, to open the No-Fault Clinics between 2014 up to and including 2021. (*Id.* ¶ 27). While purporting to be legitimate medical care clinics specializing in treating patients, the No-Fault Clinics were not owned, operated, or controlled by licensed medical practitioners. Instead, the Clinic Controllers were the actual owners, operators, and controllers of Clinics. (*Id.* ¶ 28). For instance, the Clinic Controllers took upwards of 90% of the No-Fault Clinics' proceeds; possessed the checkbooks for the Clinics' bank accounts; caused the physicians who worked at the No-Fault Clinics (the "No-Fault Physicians") to pre-sign hundreds of blank checks from these accounts; controlled the debit and credit cards for the Clinics; possessed signature stamps bearing the No-Fault Physicians' signatures; controlled hiring and firing of the Clinics' employees; invested the initial funds to establish the No-Fault Clinics; controlled where to open new Clinics; negotiated the rent for the Clinics' leases; sourced and paid for the Clinics' equipment; created the bills that were sent to the insurance companies; and chose the attorneys who would represent the No-Fault Physicians in arbitration, litigation, and sworn depositions before insurance companies. (*Id.*). The Clinic Controllers further caused the No-Fault Physicians to routinely bill automobile insurance companies for medical treatments that were either never provided, unnecessary or excessive

because the Patients did not medically need the treatments, and/or more serious treatments than the Patients actually received. (*Id.* ¶ 29).

When a Patient arrived for treatment at the No-Fault Clinics, the Patient was usually evaluated by a No-Fault Physician, who recommended a nearly identical schedule of treatments for every patient. (*Id.* ¶ 30). This schedule of treatments almost invariably included physical therapy, chiropractor, and acupuncture. (*Id.*). Nearly every time a Patient went to a No-Fault Clinic, the Patient received all three of these treatments. (*Id.*). In addition, the No-Fault Physicians prescribed prescription drugs that were medically unnecessary given the degree of the Patients' injuries; durable medical equipment ("DME") that was not tailored to the Patients' injuries; and medical resonance imaging ("MRIs") for areas of the body that lacked a clinical indication of injury. (*Id.*). The No-Fault Physicians further prescribed painful and unnecessary electrodiagnostic testing including electromyography ("EMG") and nerve conduction velocity ("NCV") testing. (*Id.*). In legitimate medical practices, physicians use EMG and NCV testing to detect neuromuscular abnormalities and nerve damage by inserting needles into the arms and legs to measure electrical activity. (*Id.*). The No-Fault Physicians, however, abused the procedures by routinely prescribing EMG and NCV testing to Patients who lacked clinical indications of neuromuscular injuries. (*Id.* ¶ 31). The Clinic Controllers profited every step of the way. In addition to receiving upwards of 90% of the proceeds from patient visits to the No-Fault Clinics, the Clinic Controllers owned the billing company that filed the No-Fault Physicians' medically unnecessary claims (the "No-Fault Billing Company") and the pharmacies that filled the No-Fault Physicians' medically unnecessary prescriptions (the "No-Fault Pharmacies"). (*Id.*). The No-Fault Physicians did not have a choice in which billing company or pharmacies they could use. (*Id.*). The Clinic Controllers required them to use the No-Fault Billing Company and No-Fault Pharmacies as part of the scheme. (*Id.*).

<u>Money Laundering</u>

The Gulkarov Organization laundered the proceeds of the No-Fault Scheme to conceal the criminal nature of the operation. (*Id.* ¶ 36). The Clinic Controllers could not transfer the proceeds of the No-Fault Scheme directly from the No-Fault Clinics' bank accounts to their personal accounts because insurance companies typically required the No-Fault Physicians to turn over several months of bank statements during Examinations under Oath ("EUOs"), and direct transfers would have exposed the Clinic Controllers' illegal involvement. (*Id.*). Instead, the Clinic Controllers caused the No-Fault Physicians to conduct several different types of financial transactions designed to maintain, promote, and conceal the illegal operation. (*Id.* ¶ 37). Among other things, the Clinic Controllers required the No-Fault Physicians to pay fees to companies that the Clinic Controllers owned and controlled. The Clinics Controllers used these fees, such as "marketing," "billing," and "rent," to make their relationship with the No-Fault Clinics appear legitimate. (*Id.*). In reality, the fees were non-negotiable, illegal, and excessive. For instance, some of these fees, such as "marketing," were ultimately used to pay bribes to fill the No-Fault Clinics with patients. (*Id.*). Other fees, such as "rent" and "billing," far exceeded the market value of these alleged services. (*Id.* ¶ 38). The Clinic Controllers further required the No-Fault Physicians to turn over the No-Fault Clinics' debit cards and credit cards and pre-sign thousands of blank checks from the No-Fault Clinics' bank accounts (the "Pre-Signed Checks"). (*Id.*). The Clinic Controllers

used the debit cards, credit cards, and Pre-Signed Checks to transfer money out of the No-Fault Clinics' accounts in several different ways:

    a.   To pay for the personal expenses of members and associates of the Clinic Controllers, including home renovation and construction, mortgages, car leases, domestic and international travel, banquets, and luxury goods.

    b.   To pay shell companies controlled by members and associates of the Clinic Controllers (the "Shell Companies").

    c.   To pay for real estate transactions conducted by Robert Wisnicki and the Wisnicki Firm. Between approximately 2016 and 2017, the Clinic Controllers made over $150,000 in payments to Wisnicki using the Pre-Signed Checks. Wisnicki thereafter paid family members of the Clinic Controllers or purchased real estate on behalf of family members of the Clinic Controllers.

(*Id.*). The Shell Companies had no legitimate business or employees. (*Id.*). However, the Shell Companies typically had names designed to create the false impression that they were involved in the practice of medicine, marketing, consulting, or transportation. (*Id.*). After the proceeds of the healthcare fraud scheme were deposited into the Shell Companies' bank accounts, the Clinic Controllers caused most of the proceeds to be withdrawn in cash in amounts less than $10,000 to avoid financial reporting requirements. (*Id.*).

Bribery

    The Clinic Controllers arranged for Runners—most notably Rose—to pay hundreds of thousands of dollars to the lead sources (*i.e.*, employees or agents of hospitals, medical service providers, police officers and 911 operators employed by the NYPD, and other entities). (*Id.* ¶ 39). These lead sources, in turn, unlawfully disclosed the protected, confidential information of tens of thousands of motor vehicle accident victims in New York, New Jersey, and elsewhere. (*Id.* ¶ 40). After obtaining the confidential information of motor vehicle accident victims, which often included victims' names, contact information, and medical information, the Runners contacted the victims and made false representations, including that the associates were calling on behalf of the New York State Department of Transportation. (*Id.*). The Runners made these false representations to steer the victims to receive medical treatment from a select "network" of clinics and lawyers in New York, New Jersey, and elsewhere, including the No-Fault Clinics and lawyers that were a part of the Gulkarov Organization. (*Id.* ¶ 41). The Clinic Controllers paid the Runners approximately $1,500 to $3,000 per successful "referral." (*Id.*). The Runners then took a portion of the kickbacks for themselves and funneled the rest of the money to the lead sources that provided the confidential information. (*Id.*). As part of the scheme, the Clinic Controllers also paid cash bribes to the No-Fault Physicians and practitioners at other no-fault clinics to prescribe medically unnecessary, topical compound creams from the No-Fault Pharmacies. (*Id.* ¶ 42).

### B. Procedural and Case History

On November 15, 2023, the defendant appeared before your Honor and pleaded guilty pursuant to a plea agreement to one count of conspiracy to commit healthcare fraud, in violation of Title 18, United States Code, Section 371, and one count of conspiracy to commit healthcare fraud, in violation of Title 18, United States Code, Section 371, and one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 371. In connection with his plea, Khaimov admitted to the following statement of agreed upon facts:

(1) From at least in or about 2014 up to and including in or about 2021, the defendant agreed with others (collectively, the "Clinic Controllers") to unlawfully own and run clinics and pharmacies located in the New York area. The defendant knew that clinics and pharmacies are unable to bill insurance companies for No-Fault benefits if the medical facilities are controlled by non-physicians. The defendant nonetheless agreed with others to submit bills to insurance companies falsely representing that the clinics were owned and operated by licensed medical practitioners, and for medical practitioners to lie under oath during Examinations under Oath ("EUOs") about the ownership, control, and finances of the clinics and pharmacies. The defendant personally coached at least one medical practitioner to lie under oath. The defendant and his fellow Clinic Controllers unlawfully obtained from insurance companies at least $40,000,000 as part of the scheme.

(2) In connection with the scheme described above, the defendant personally approached physicians and directed them to prescribe unnecessary medical treatments (including MRIs, Electromyography ("EMG")/Nerve Conduction Velocity ("NCV") testing, spinal injections, and computerized radiologic mensuration analysis), unnecessary durable medical equipment (including cervical home traction devices and lumbar back support), and medically unnecessary medications (including prescription strength painkillers, topical creams, and topical gels). The defendant received kickbacks from MRI facilities, pain management doctors, and other specialized care providers, who performed these unnecessary medical treatments. The defendant further personally arranged for the unnecessary medications and durable medical equipment to be filled at pharmacies under the control of the defendant and his co-conspirators.

(3) The defendant further arranged for physicians beyond those directly under his control to prescribe unnecessary medications and durable medical equipment. For instance, the defendant approached physicians and clinic managers working at other medical offices and paid them to prescribe unnecessary pharmaceuticals, provided that the pharmaceuticals were filled at pharmacies under the control of the defendant and his coconspirators.

(4) The defendant and his fellow Clinic Controllers further agreed to pay bribes in connection with the above-described scheme. From at least in or about 2014 up to and including November 2019, the defendant agreed with others to pay bribes to hospital employees, 911 dispatchers, and other individuals for the confidential names and numbers of motor vehicle accident victims. As part of the scheme, the defendant and others provided approximately $150,000 for the creation of a call center, operated by Anthony Rose, a/k/a "Todd Chambers," that called victims and lied to them to induce victims to receive medical

treatment at, among other places, clinics controlled by the defendant and his coconspirators. The defendant further personally paid Anthony Rose hundreds of thousands of dollars in bribe payments in cash for referrals to the clinics and pharmacies.

(5) As part of the bribery scheme, the defendant also personally attempted to recruit others to disclose confidential names and numbers of motor vehicle accident victims. These people included, among others, a hospital employee. The defendant was ultimately unsuccessful because these other individuals refused to provide confidential information.

(6) The defendant laundered the proceeds of the healthcare fraud from the bank accounts of the medical clinics and pharmacies to personal accounts using a variety of methods. Among other things:

a. The defendant agreed with others to tell medical practitioners to sign blank checks from the clinics' bank accounts, which the defendant used to pay personal expenses such as his home mortgage, tuition for his children, a Mercedes Benz, and the purchase and renovation of multiple properties including but not limited to 409 Rockaway Ave., Brooklyn, NY 11212; 3506 Neptune Ave, Brooklyn, NY 11224; 3508 Neptune Ave, Brooklyn, NY 11224; and 3514 Neptune Ave, Brooklyn, NY 11224.

b. The defendant arranged for the clinics and pharmacies to pay his company, A&P Holdings, exorbitant "rent" payments that far exceeded fair market value, as well as transfer hundreds of thousands of dollars to shell companies under his or his brother's control, including New Business Funding, K&L Consulting Inc, Neptune Human Services, New Business Resources, P&K Marketing, New Capital Resources, and ABE ACQ LLC.

c. The defendant arranged for checks from the clinics' bank accounts to be cashed at over a dozen shell companies under his control or the control of co-conspirators, including, for instance, "Sign N Drive Auto GRP," "Transport on Wheels," and "Sancus Consulting & Trading Inc." Over two dozen of these shell companies were opened by foreign nationals, who entered the country on tourism visas, opened bank accounts for the shell companies, provided the debit cards to the defendant's coconspirators, and then left the country.

d. The defendant agreed to use the Wisnicki & Associates and Wisnicki Neuhauser (collectively, the "Wisnicki Firm") to launder proceeds from the No-Fault scheme. The defendant and his fellow Clinic Controllers wrote over $150,000 in checks to the Wisnicki Firm from the No-Fault clinics' bank accounts. The Wisnicki Firm did not provide any legal services to the No-Fault clinics. Instead, the Wisnicki Firm used this money to purchase real estate for the defendant and his brother. The defendant and his coconspirators deducted the payments to the Wisnicki Firm on the clinics' tax returns as legal expenses.

(7) Lastly, in or about early 2022, the defendant approached a cooperating witness (the "CW"), who was the registered owner of one of the defendant's pharmacies. The defendant drove to the CW's house and began honking his car horn outside. The CW came out, at which point the defendant told the CW that he heard the CW was speaking with law enforcement. The defendant instructed the CW to stop doing so.

## C. Discussion

The most important sentencing factors in this case are the need to reflect the seriousness of the defendant's offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to this defendant and other similarly situated individuals. *See* 18 U.S.C. § 3553(a)(2)(A)-(C). All of these considerations weigh in favor of a sentence of 180 months in prison.

### 1. The Nature and Seriousness of the Offense, the Need for Just Punishment, and the Need for General Deterrence

Khaimov and Gulkarov were co-leaders of one of the largest bribery and healthcare fraud conspiracies ever charged in this District. The scheme victimized tens of thousands of New Yorkers and defrauded insurers of approximately $40 million. Khaimov and Gulkarov unlawfully owned, operated, and controlled over two dozen clinics and pharmacies throughout the New York area. Khaimov organized and opened the illegal pharmacies, and Gulkarov organized and opened the illegal clinics.

Khaimov and Gulkarov took the lion's share of the practices' proceeds and turned the clinicians into employees. But this was not enough. Khaimov *personally approached* physicians and directed them to prescribe unnecessary medical treatments (including MRIs, EMG/NCV testing, spinal injections, and computerized radiologic mensuration analysis), unnecessary durable medical equipment (including cervical home traction devices and lumbar back support), and medically unnecessary medications (including prescription strength painkillers, topical creams, and topical gels). Khaimov received kickbacks from MRI facilities, pain management doctors, and other specialized care providers, who performed these unnecessary medical treatments. Khaimov further personally arranged for the unnecessary medications and durable medical equipment to be filled at pharmacies under his control and the control of his co-conspirators.

Khaimov did not stop there. He also instructed his employees to overbill insurance companies for the unnecessary equipment and pharmaceuticals—thereby defrauding insurers twice. For instance, in February 2017, Khaimov had the following wiretapped conversation with an employee:

| | |
|---|---|
| KHAIMOV: | No, change, change, change the billing amount, that's all. Ok? |
| EMPLOYEE: | But, but how to change it now . . . . they always told me it's one set price. How can a change be made now? I know how to change it, I'm just saying… |
| KHAIMOV: | You fucking change it! |
| EMPLOYEE: | Yeah, but the thing is, Peter, everything is already set. These prices are based on a catalogue that I got that numbers originally from. |

KHAIMOV:        No. You could change it.
EMPLOYEE:      Can I talk to Iris about changing it?
KHAIMOV:        No, you talk to me.

The Government requisitioned an expert analysis of 100 randomly selected claims filed from Smart Choice Medical PC, one of the primary clinics involved in the scheme.[1] The expert reports are incorporated herein as Exhibits A and B. The findings are shocking. As set forth in the reports:

> The striking feature within these records is the absence of patient specific care. Rather, the care is virtually a carbon copy moving from record to record. Treatment is received from different Smart Choice Medical providers at 2 separate locations of practice, yet the management of patients is almost entirely identical. This is a scripted patient management plan, not developed in reaction to patient medical histories or examination demonstrated needs. Care instead follows a predetermined clinical pathway. The most alarming aspect of the care plan is that it is not designed or formulated to provide the best opportunities for the patients' recovery. In fact, it is the opposite. Unfortunately, patients require far longer durations of treatment with poorer outcomes and greater unnecessary testing than would be anticipated. These are fortunately generally minor motor vehicle accident related injuries, classified as sprains/strains and soft tissue injuries at lower severity, grades 1 or 2. Minor to modest injuries such as these have recovery times expected to be from a few weeks to up to 6 to 8 weeks. It is always possibly a small number of such patients have a more protracted recovery. However, these patients reviewed, despite the majority of the patients being young adults ages 20 to 40, do not recover in times close to the anticipated time frame. The Smart Choice Medical care plan may be a poorly structured patient management process that does not benefit patients and/or there are other reasons for prolonging treatment or delayed recovery.

> An additional unanticipated finding is the large percentage of patients that are diagnosed as having more significant or worsening medical conditions than would be associated with low velocity impact motor vehicle accidents. These diagnoses are not supported by examination findings or traditional medical testing. Patients are referred for a volume of additional testing beyond that generally performed following the accident. Many conditions diagnosed appear to be supported only by greater than anticipated pain and soreness after these motor vehicle accidents. As a result of this, Smart Choice Medical providers make numerous referrals to pharmacies, medical laboratories, durable medical equipment vendors and additional medical providers including some recommending or performing additional tests. High cost testing and a procedure based treatment process is identified repeatedly in multiple records. It is not matched to improvements but rather leads to even more procedural testing in many of the cases reviewed. Most patients report no sustained benefit from this management.

---

[1] The expert analysis was conducted by Dr. Mark Kaufman, who has been practicing medicine for nearly 45 years. Dr. Kaufman's resume is attached as Exhibit C.

(*See* Exhibit A at 1-2).

The toll of these unnecessary medical treatments, equipment, and medications cannot be overstated. Motor vehicle accidents are terrifying events. Victims' lives are upended. They suffer psychological, physical, and emotional injuries. And they go to physicians for help. Yet Khaimov corrupted the relationship between patient and provider by arranging for clinicians to lie to patients about their injuries, subject patients to painful and unnecessary treatments, and dupe patients into using unnecessary equipment and pharmaceuticals. Khaimov victimized patients again, and again, and again, and became a wealthy man in the process.

The harm to patients that resulted from the defendant's conduct extended beyond unnecessary treatments. Khaimov, Gulkarov, and Israilov also jointly opened and funded Rose's call center, which played a central role in unlawfully acquiring tens of thousands of patients' personally identifying information. Khaimov, Gulkarov, and Israilov identified the physical space for the call center, outfitted the location with desks, computers, and phones, and paid Rose hundreds of thousands of dollars in bribe money. Khaimov, Gulkarov, and Israilov are the reason that Rose's call center came into existence.

Unlike Israilov, however, Khaimov continued to play an active role Rose's bribery operation after the call center was opened. While Gulkarov was primarily responsible for paying Rose kickbacks for illegal patient referrals to the clinics, Khaimov was responsible for paying Rose kickbacks for patient referrals to the pharmacies. Khaimov and Gulkarov collectively paid Rose hundreds of thousands of dollars for these illegal referrals. Khaimov also personally attempted to recruit his own "lead sources," *i.e.*, hospital employees and 911 operators, into the scheme. Thus, for instance, in February 2017, Khaimov had the following wiretapped conversation with a hospital employee:

KHAIMOV:      No, you did not understand me.  You know what I need?  I need, when people get into an accident, I need their… their name, first, last name, first name and, uh, what do you call it, and the telephone number.
EMPLOYEE:     I don't know.  Why do you need it?
KHAIMOV:      Well, I will need to explain it to you later when we meet.  It will be good for you also.
EMPLOYEE:     No, no I don't need it.  I don't play these games, and I don't want to be involved.

Khaimov knew what he was doing was wrong. The hospital employee rebuffed his efforts in the strongest terms possible. But Khaimov continued to pay kickbacks to Rose for another two-and-a-half years—up to the day that Rose was arrested.

Khaimov also actively concealed his crimes. New York state specifically vests insurance carriers with the right to conduct Examinations under Oath and deny coverage if clinicians lie or fail to attend. These examinations are carriers' most powerful means of rooting out healthcare fraud schemes. Khaimov, Gulkarov, and Israilov for years coached nearly a dozen clinicians to perjure themselves during examinations. In doing so, they attacked a foundational component of our regulatory system. As the Second Circuit has noted, "The sanctity of an oath is central to the

sound administration of justice. An oath impresses on one's conscience the duty to testify truthfully." *United States v. Parse*, 789 F.3d 83, 118 (2d Cir. 2015). "Today, the need to punish perjurers—through contempt proceedings, criminal prosecutions, or both—is no less acute." *United States v. Daugerdas*, 867 F. Supp. 2d 445, 484 (S.D.N.Y. 2012), *vacated and remanded sub nom. United States v. Parse*, 789 F.3d 83 (2d Cir. 2015). Khaimov's utter disregard for the sanctity of the oath calls into question whether he can ever be deterred from committing future crimes. But a message must be sent that lying during Examinations under Oath—and coaching others to do so—will result in severe consequences. Otherwise schemes just like these will continue.

Khaimov's offense conduct, however, did not end with perjury. Khaimov also actively sought to intimidate a cooperating witness (the "CW"). As set forth in Khaimov's plea agreement, after Khaimov had been indicted, he approached the CW, who was the registered owner of one of the defendant's pharmacies. The defendant drove to the CW's house and began honking his car horn outside. The CW came out, at which point the defendant told the CW that he heard the CW was speaking with law enforcement. The defendant instructed the CW to stop doing so.

This conduct is outrageous. The CW was a longtime coconspirator of Khaimov and had extensive knowledge of the No-Fault fraud. Khaimov nonetheless willfully and intentionally sought to curtail the CW's cooperation. A sentence at the top of the Guidelines range is necessary to send a clear message to others that such outrageous conduct will be severely punished.

This message is particularly important given the staggering financial impact of these types of healthcare fraud schemes. Khaimov pocketed approximately $17.5 million in illegal proceeds over the course of the scheme and laundered the money through *four* different mechanisms to hide his involvement: (1) Khaimov agreed with others to tell medical practitioners to sign blank checks from the clinics' bank accounts, which the defendant used to pay personal expenses; (2) he arranged for the clinics and pharmacies to pay his company, A&P Holdings, exorbitant "rent" payments that far exceeded fair market value, as well as transfer hundreds of thousands of dollars to shell companies under his or his brother's control; (3) he arranged for checks from the clinics' bank accounts to be cashed at over a dozen shell companies under his control or the control of co-conspirators; *over two dozen* of these shell companies were opened by foreign nationals, who entered the country on tourism visas, opened bank accounts for the shell companies, provided the debit cards to the defendant's coconspirators, and then left the country; and (4) he agreed to use the Wisnicki & Associates and Wisnicki Neuhauser (collectively, the "Wisnicki Firm") to launder proceeds from the No-Fault scheme. The sophistication of Khaimov's money laundering is astonishing.

Khaimov's money laundering is particularly outrageous given that he has refused to disclose his financial information to Probation and has filed materially false financial affidavits with Probation and the Government. Although Khaimov submitted a financial statement to Probation, he "did not supply supporting financial documentation along with the financial statement" and a "request for additional information was submitted to defense counsel via email correspondence and the information is awaited." (PSR ¶ 132). Moreover, Khaimov's affidavits to Probation and the Government omitted significant assets. As part of the parties' plea agreement, the Government required Khaimov to produce to the Government a financial affidavit (the

"Government Affidavit"), incorporated as <u>Exhibit D</u>. Unlike the affidavit to Probation, Khaimov's Government Affidavit omitted Khaimov's jointly titled, $3.8 million four-bedroom, three-and-a-half bathroom house as an asset. (PSR ¶ 132). Khaimov's affidavit to Probation, in turn, omitted that Khaimov was a "50% owner of A&P Rockaway, LLC, which owns property at 407 & 409 Rockaway Avenue, in Brooklyn," (Exhibit D ¶ 2), and a "Rolex watch, valued at approximately $20,000.00," (*id.* ¶ 5), which were included in his Government Affidavit.

These are not the only omissions. On or about July 22, 2021, Gilead Sciences ("Gilead") filed a civil lawsuit against Khaimov (who also uses the last name Khaim) and others alleging that Khaimov was selling counterfeit HIV medications. *See Gilead Sciences Inc. v. Peter Khaim et al.*, 1:21-cv-04106-AMD-JAM, Dkt. 1. Gilead conducted a comprehensive analysis of Khaimov's finances using records obtained through discovery. (*See* Sixth Amended Complaint, *Gilead Sciences Inc. v. Peter Khaim et al.*, 1:21-cv-04106-AMD-JAM, Dkt. 156). As set forth in Gilead's Sixth Amended Complaint, Khaimov has a long history of making phony real estate transactions to friends and family. None of these were disclosed in his financial affidavit to Probation or the Government:

- <u>65-16 Fleet Street, Forest Hills, New York 11375</u>: Relief Defendant Poltilova is the wife of Defendant Peter Khaim. Relief Defendant Poltilova owns a property located at 65-16 Fleet Street, Forest Hills, New York 11375 (the "Fleet Street Property"). (*Id.* at ¶ 176). Defendant Peter Khaim purchased the Fleet Street Property in his own name on November 7, 2014. (*Id.*). Then, on November 11, 2014, Defendant Khaim deeded the property to Relief Defendant Poltilova for no consideration. (*Id.*). Despite the transfer to Poltilova, and despite Poltilova's current ownership of the Fleet Street Property, Defendant Khaim continues to act as the de facto owner of the Fleet Street Property. (*Id.*). Defendant Khaim funded various projects for the Fleet Street Property and paid taxes for the property from his personal bank account, including during the period of his counterfeiting activities, described below. (*Id.*). Defendant Peter Khaim will be the beneficiary of the sale of the Fleet Street Property, which, as of date of the filing of the Sixth Amended Complaint, is in progress. (*Id.*).

- <u>B&O Estates LLC</u>: Relief Defendant B&O Estates LLC ("B&O") is a New York limited liability company with a principal place of business in New York under the dominion and control of Defendant Peter Khaim. (*Id.* at ¶ 177). B&O's organizing documents list the New York Secretary of State as its designated agent, and directs the Secretary of State to mail copies of process to 71-30 Yellowstone Blvd, Forest Hills, NY 11375. (*Id.*). Defendant Peter Khaim's wife, Relief Defendant Oksana Poltilova, and father, Boris Khaimov, are the listed organizers of B&O. B&O purchased a property located at 6936 Dartmouth Street, Forest Hills, New York (the "Dartmouth Street Property") on May 18, 2018. (*Id.*). Defendant Khaim orchestrated the transfer of funds for the purchase of the property. (*Id.*). Subsequent to the purchase, Defendant Khaim funded B&O and paid for the maintenance, improvement, and mortgage on the Dartmouth Street Property with proceeds of the sale of counterfeit Gilead-branded medication. (*Id.*). As of the date of the Sixth Amended Complaint, the Dartmouth Street Property is being advertised for sale. (*Id.*). If the Dartmouth Street Property were sold, Defendant Khaim would control the proceeds of that sale. (*Id.*).

- <u>214 Jamaica LLC</u>: Relief Defendant 214 Jamaica LLC is a New York limited liability corporation with a principal place of business in New York under the dominion and control of Defendant Peter Khaim. (*Id.* at ¶ 178). 214 Jamaica LLC's organizing documents list the New York Secretary of State as its designated agent, and directs the Secretary of State to mail copies of process to The Limited Liability Company, 214-80 Jamaica Avenue, Queens Village, NY 11428. (*Id.*). 214 Jamaica LLC is the direct recipient of real property purchased with counterfeiting proceeds. (*Id.*). Defendant Peter Khaim provided the funds for the purchase of property located at 214-80 Jamaica Avenue and 215-02 Jamaica Avenue, Jamaica, NY (the "Jamaica Avenue Property") using the proceeds of his sale of counterfeit Gilead-branded HIV medications. (*Id.*). Defendant Khaim attended the closing for the Jamaica Avenue Property along with his mother, Riva Mushiyeva, who signed closing documents on behalf of 214 Jamaica LLC. (*Id.*). Defendant Khaim has also coordinated the improvement and construction upon the Jamaica Avenue Property, which he has also paid for using the proceeds of his counterfeiting of Gilead-branded medications. (*Id.*). If the Jamaica Avenue Property were sold, Defendant Khaim would control the proceeds of that sale. (*Id.*).

- <u>Khaim Family Irrevocable Living Trust</u>: Relief Defendant Mark Politov, added solely in his capacity as the Trustee for the Khaim Family Irrevocable Living Trust (the "Khaim Trust") is an individual residing in Rego Park, New York. (*Id.* at ¶ 179). The Khaim Trust itself is an irrevocable trust established under New York law. (*Id.*). Defendant Peter Khaim and Relief Defendant Oksana Poltilova are Grantors to the Trust, with their address listed at the Fleet Street Property; their children are its beneficiaries; and Mark Poltilov, the Trustee, is Defendant Khaim's brother-in-law. (*Id.*). The Khaim Trust is the recipient of counterfeiting proceeds through improvements to a property it owns located at 182-60 Radnor Road, Jamaica, NY (the "Radnor Road Property"). (*Id.*). Defendant Peter Khaim purchased the Radnor Road Property in his own name, then transferred it to the Khaim Trust for no consideration. (*Id.*). Thereafter, Khaim coordinated significant improvements on the property, including construction of a lavash mansion, which he paid for using the proceeds of his counterfeiting activity. (*Id.*). If the Radnor Road Property were sold, Defendant Khaim would control the proceeds of that sale. (*Id.*).

- <u>91 Park LLC</u>: Relief Defendant 91 Park LLC is a New York limited liability company with a principal place of business in New York under the dominion and control of Defendant Peter Khaim. (*Id.* at ¶ 181). 91 Park LLC's organizing documents list the New York Secretary of State as its designated agent, and directs the Secretary of State to mail copies of process to Allstate Corporate Services Corp., 99 Washington Ave., Suite 1008, Albany, NY 112260. (*Id.*). Relief Defendant 91 Park LLC purchased a property located at 91-08 & 91-10 63rd Drive, Rego Park, New York (the "First 63rd Drive Property") on April 3, 2019. (*Id.*). Defendant Peter Khaim's father, Boris Khaimov, signed the closing documents on behalf of 91 Park LLC, but the documents originally listed Peter Khaim's name, which Mr. Khaimov crossed out by hand, filling in his own name. (*Id.*). Defendant Khaim caused funds used to purchase the First 63rd Drive Property to be transmitted to the seller, and provided instructions to the buyer's counsel in connection with the purchase. (*Id.*). If the First 63rd Drive Property were to be sold, Defendant Khaim would control the proceeds of that sale. (*Id.*).

- <u>91 Rego LLC</u>: Relief Defendant 91 Rego LLC is a New York limited liability company with a principal place of business in New York under the dominion and control of Defendant Peter Khaim. (*Id.* at ¶ 182). 91 Park LLC's organizing documents list the New York Secretary of State as its designated agent, and directs the Secretary of State to mail copies of process to 91-12 63rd Drive, Rego Park, NY 11374 (the "Second 63rd Drive Property"). (*Id.*). Relief Defendant 91 Rego LLC purchased the Second 63rd Drive Property on April 17, 2019, with Boris Khaimov, Defendant Peter Khaim's father, signing the closing documents on behalf of the company. (*Id.*). Defendant Khaim funded the purchase of the property, including using an account he controls in the name of A&P Holding Group Corp. (*Id.*). Defendant Khaim also provided instructions to the buyer's counsel in connection with the purchase. (*Id.*). Defendant Khaim has listed himself as the owner of the Second 63rd Drive Property in publicly filed documents, and coordinated improvements to the property, which he paid for using the proceeds of the sale of counterfeit Gilead-branded HIV medications. (*Id.*). If the Second 63rd Drive Property were to be sold, Defendant Khaim would control the proceeds of that sale. (*Id.*).

- <u>93 Everton LLC</u>: Relief Defendant 93 Everton LLC is a New York limited liability company with a principal place of business in New York under the dominion and control of Defendant Peter Khaim. (*Id.* at ¶ 183). 93 Everton LLC's organizing documents list the New York Secretary of State as its designated agent, and directs the Secretary of State to mail copies of process to 71-30 Yellowstone Blvd, Forest Hills, NY 11375. (*Id.*). 93 Everton LLC purchased a property located at 6315 Everton Street, Rego Park, NY (the "Everton Street Property") on January 3, 2020. (*Id.*). Defendant Peter Khaim funded the purchase of the Everton Street Property, coordinated and paid for improvements to the property, and permitted his co-conspirator, Defendant Zafar Abdullaev, to live there. (*Id.*). If the Everton Street Property were to be sold, Defendant Khaim would control the proceeds of that sale. (*Id.*).

To be sure, Khaimov has agreed to forfeit a single asset—his 50% interest in 407 & 409 Rockaway Avenue, which he omitted as an asset in his affidavit to Probation. However, Khaimov should receive minimal credit because forfeiture of this property was inevitable. Khaimov purchased and renovated 407 & 409 Rockaway Avenue using proceeds from the healthcare fraud scheme and opened multiple illegal clinics and pharmacies at the location. This property is the definition of the "fruits" and "instrumentalities" of the No-Fault scheme.

In sum, Khaimov was a leader in one of the largest bribery and healthcare fraud schemes ever charged in this District and which victimized tens of thousands of New Yorkers for half a decade. He has made millions of dollars in illicit proceeds and has systematically hidden his assets to avoid financial liability. A Guidelines sentence of 180 months' imprisonment is necessary to reflect the seriousness of the defendant's offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to this defendant and other similarly situated individuals.

### 2. The Need to Avoid Unwarranted Sentencing Disparities

The next factor, the need to avoid unwarranted sentencing disparities, further supports a sentence of 180 months' imprisonment. Khaimov, without a doubt, is significantly more culpable than Israilov, who received a sentence of 84 months' imprisonment. The question is whether Khaimov's extraordinary history of criminal conduct and omissions of material assets in his financial affidavits warrant a greater sentence than that of Gulkarov. Khaimov has pleaded guilty to offenses carrying a higher statutory maximum and Guidelines range than Gulkarov—15 years' imprisonment versus 12 years' imprisonment.[2]

To be sure, Gulkarov engaged in a shocking obstruction and witness tampering scheme that went far beyond Khaimov's tampering with the CW. This brazen attempt to disrupt the Government's investigation—in combination with Gulkarov's extensive criminal conduct as a coleader of the No-Fault scheme—warrants a sentence of 12 years' imprisonment for Gulkarov.

Nonetheless, the statutory maximum and recommended Guidelines sentence of 15 years' imprisonment is appropriate against Khaimov. Unlike Gulkarov, Khaimov is a career fraudster whose crimes go far beyond the charged No-Fault scheme. Khaimov began committing healthcare fraud in 2013—over a year before Gulkarov—when he initially targeted Medicare. As set forth in the PSR, Khaimov began bribing Medicare patients to come to his pharmacy, 21st Century, with prescriptions. (PSR ¶ 49). Khaimov then billed Medicare for the prescriptions but did not dispense the medicine. (*Id.*) Instead, Khaimov simply pocketed the money from Medicare and paid the patients a portion. (*Id.*) The scheme went on for over two years (2013 to 2015) until he transitioned to the charged No-Fault scheme because he was concerned about getting caught by Medicare investigators. (*Id.*)

Moreover, as the Court is aware from the Government's motions *in limine*, while the No-Fault Fraud was ongoing, Khaimov *also* defrauded drug manufacturers and private insurers by billing for fraudulent prescriptions (the "Drug Manufacturer Fraud" and the "Private Insurer Fraud," respectively). Khaimov used the pharmacies under his control to submit bills (or "coupons") directly to drug manufacturers for hundreds of prescriptions for fake patients. Khaimov also submitted bills to private insurers for fake prescriptions for employees of the Pharmacies.

Were that not enough, Khaimov has also been convicted of a nearly identical but separate criminal conspiracy in the United States District Court for the Eastern District of New York ("EDNY"). On November 3, 2022, Khaimov plead guilty pursuant to a plea agreement to money laundering in EDNY. As set forth in the EDNY Indictment, between August 2018 and August 2020, Peter Khaimov and his brother Arkadiy fraudulently opened and controlled approximately thirteen different pharmacies (the "EDNY Pharmacies") and concealed their involvement in the EDNY Pharmacies by paying straw owners to open bank accounts for the EDNY Pharmacies and by falsely representing their ownership of the EDNY Pharmacies to regulators. *See United States v. Peter Khaim and Arkadiy Khaimov*, 20-cr-580, (E.D.N.Y., Dec. 18, 2020) (Dkt. 1 ¶¶ 30-35). The Khaimovs then used the EDNY Pharmacies to falsely bill Medicare for medications that were

---

[2] The Government intends to seek the recommended Guidelines sentence of 12 years' imprisonment for Gulkarov.

never dispensed by the pharmacies or were not medically necessary. (*Id.* ¶¶ 36-39). The Khaimovs further laundered the fraud proceeds from the bank accounts of the EDNY Pharmacies to their personal possession using a network of shell companies (the "EDNY Shell Companies"). (*Id.* ¶¶ 42-47). The Khaimovs fabricated invoices to make it appear that the EDNY Shell Companies were selling pharmaceutical drugs to the EDNY Pharmacies, when in actuality the EDNY Shell Companies were solely engaged in money laundering. (*Id.*).

Khaimov pled guilty to the money laundering charge of the EDNY Indictment pursuant to a written plea agreement (attached as <u>Exhibit E</u>). As set forth in the agreement, Khaimov stipulated to enhancements for laundering more than $9,500,000 in illegal proceeds and sophisticated laundering, (Exhibit E ¶ 2), forfeiture of $2,753,129, (*id.* ¶ 6), and restitution of $18,921,139.21, (*id.* at ¶ 1.e). Khaimov further agreed not seek a sentence below 87 months' imprisonment, and the Government calculated Khaimov's Guidelines range as 151 to 188 months' imprisonment. (*Id.* ¶ 2).[3]

This long history of criminal conduct is extraordinary. It is even more outrageous given that Khaimov has hid what he has done with the illegal money from all these schemes. Khaimov has made tens of millions of dollars from overlapping healthcare fraud schemes spanning nearly a decade—yet his false and misleading financial affidavits to the Government and Probation portray him as a pauper.

As such, the need to avoid unwarranted sentencing disparities, further supports a sentence of 180 months' imprisonment.

### 3.  Khaimov's Individual Characteristics

Khaimov's personal characteristics lastly support a sentence of 180 months' imprisonment. Khaimov is a high school and college graduate. (PSR ¶¶ 123-24). Between 2007 and 2009, he had legitimate employment as a restaurant employee, barber, and driver. (*Id.* ¶¶ 128-30). Khaimov was not coerced or manipulated into participating in a decade of healthcare fraud. He did not grow up in a broken home like Berlisa Bryan, who survived on food stamps while her mother abused crack cocaine. He was not the victim of horrific sexual abuse like Christina Garcia and Yaniris Deleon. He had all the tools to be successful. Yet he made a deliberate decision to forgo legitimate employment because criminal conduct was more lucrative. This was his choice, and his choice has consequences.

### D. Conclusion

In sum, a sentence of 180 months reflects the seriousness of this criminal conduct and the need to impose a significant cost on the defendant's engagement in one of the largest no-fault

---

[3] The parties dispute in the EDNY plea agreement whether a 4-point leadership enhancement is warranted. (Exhibit E ¶ 2). The Government calculated the Guidelines range of 151 to 188 months' imprisonment using the enhancement. The plea agreement does not calculate an alternative Guidelines range in the event that some lessor form of the enhancement applies.

automobile insurance fraud schemes ever prosecuted. Accordingly, the Government respectfully submits that a sentence of 180 months is appropriate in this case.[4]

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: _____/s/_____
     Mathew Andrews
     Ryan Allison
     Timothy Capozzi
     Assistant United States Attorneys

---

[4] As part of his Plea Agreement, the defendant agreed to pay no less than $40,000,000 in restitution. The Government respectfully requests permission to submit a proposed restitution order by June 24, 2024, the deadline set by the Court for the Government's proposed restitution order against Israilov. (*See* Dkt. 484). At the time of his guilty plea, the defendant also consented to forfeiture of the same amount, joint and several with Gulkarov and Israilov. (*See* Dkt. 362).

# Exhibit A

**Mark A. Kaufman, M.D.**
*Board Certified in Neurology, Member of American Academy of Neurology*
*Board Certified in Electromyography*

152 East Main Street • Suite E • Huntington • NY 11743 • Tel: 631-351-1717 • Fax: 631-351-7038

November 5, 2021

Report: Smart Choice Medical, PC

Purpose of the Report

As requested by the US Attorney's Office, I have reviewed the records of 55 patients treated between 2016 and 2020 by health care providers of Smart Choice Medical, PC, a medical practice with locations in Bronx and Brooklyn within New York City. All of the patients were involved in motor vehicle accidents with payment for medical services requested through automobile insurance. The records were reviewed in a comprehensive fashion. Specifically, the entire patient records have been reviewed including the medical histories and physical examinations, therapies initiated, consultations requested from other providers, testing ordered as well as documentation within the medical record. Also, the care plans followed in each case are studied to determine if this medical practice is designed for the best results possible for these patients. References to cost effectiveness of patient care comparing these patients to the usual outcomes of their medical conditions are encompassed. A specific test procedure, electromyography and nerve conduction velocity testing, is reviewed at length within this report as it is specifically within my expertise as a neurologist. I supervised and directed a medical university teaching and testing program specializing in this procedure for a number of years.

Summary of Findings:

The striking feature within these records is the absence of patient specific care. Rather, the care is virtually a carbon copy moving from record to record. Treatment is received from different Smart Choice Medical providers at 2 separate locations of practice, yet the management of patients is almost entirely identical. This is a scripted patient management plan, not developed in reaction to patient medical histories or examination demonstrated needs. Care instead follows a predetermined clinical pathway. The most alarming aspect of the care plan is that it is not designed or formulated to provide the best opportunities for the patients' recovery. In fact, it is the opposite. Unfortunately, patients require far longer durations of treatment with poorer outcomes and greater unnecessary testing than would be anticipated. These are fortunately generally minor motor vehicle accident related injuries, classified as sprains/strains and soft tissue injuries at lower severity, grades 1 or 2. Minor to modest injuries such as these have recovery times expected to be from a few weeks to up to 6 to 8 weeks. It is always possibly a small number of such patients have a more protracted recovery. However, these patients reviewed, despite the majority of the patients being young adults ages 20 to 40, do not recover in times close to the anticipated time frame. The Smart Choice Medical care plan may be a poorly structured patient management process that does not benefit patients and/or there are other reasons for prolonging treatment or delayed recovery.

**Page 2**

An additional unanticipated finding is the large percentage of patients that are diagnosed as having more significant or worsening medical conditions than would be associated with low velocity impact motor vehicle accidents. These diagnoses are not supported by examination findings or traditional medical testing. Patients are referred for a volume of additional testing beyond that generally performed following the accident. Many conditions diagnosed appear to be supported only by greater than anticipated pain and soreness after these motor vehicle accidents. As a result of this, Smart Choice Medical providers make numerous referrals to pharmacies, medical laboratories, durable medical equipment vendors and additional medical providers including some recommending or performing additional tests. High cost testing and a procedure based treatment process is identified repeatedly in multiple records. It is not matched to improvements but rather leads to even more procedural testing in many of the cases reviewed. Most patients report no sustained benefit from this management.

A number of aspects of care are detailed in the following sections:

INITIATION OF CARE AT SMART CHOICE MEDICAL

Patients coming to Smart Choice Medical for initial evaluation and treatment begin chiropractic and acupuncture treatments on the day of the first visit. Both treatment processes then continue 3 times weekly on the same days each week. Physician evaluation follows the initial visit in as little as a few days or rarely as long as 2 weeks later. Every patient evaluated by physicians is enrolled in physical therapy also 3 times weekly on the same days as the ongoing chiropractic treatment and acupuncture; every patient is treated in the identical fashion.

Acupuncture treatment includes cupping, an ancient treatment providing a vacuum effect on areas of the skin to remove elements of inflammation and improve circulation. Cupping, as performed on most patients, and acupuncture for all patients together have no proven track record of benefit following sprain/strain injury. One would anticipate if every patient with sprain/strain injuries of the spine receives this therapy, the results should be beneficial for patients. However, the Smart Choice Medical patients do not do better than average for their diagnosis, they do significantly worse. Chiropractic care, although started early in all records reviewed, is also not providing the 6-8 week recovery time that is anticipated. Studies of large volumes of patients treated post motor vehicle accidents with PT as sole mechanical therapy generally recover from minor/modest injury by 6-8 weeks. This raises the possibility that one or more of the utilized trio of therapies at Smart Choice Medical, acupuncture, chiropractic care and PT are delaying patient recovery. These 3 treatment modalities should be started separately and on different schedules, ideally introduced individually, only one at a time. Also, treatment should start with PT alone to attempt matching the 6-8 week anticipated time of recovery. Smart Choice Medical made no adaptations or changes in the plan used, all treatments together from outset on same days.

All 55 patient records reviewed show that the initial physician visit is after starting treatments, not before. Patient charts do not include how they selected Smart Choice Medical for

care. They appear to have no documentation of a referring party making it unclear as to why or per who acupuncture and chiropractic evaluations and treatment begin on that initial date. Patients possibly were referred to Smart Choice Medical by outside providers, family, friends or attorneys but records do not indicate such. It is customary in practice to send a summary of the initial visit to a patient's personal physician, but the Smart Choice Medical physicians have not done so.

All patients evaluated by chiropractic providers at Smart Choice Medical are diagnosed with 1 or more spine levels of spinal ligament sprain. The clinical incidence of spinal ligamentous sprain in mild to moderate motor vehicle impact accidents is far less than this and occurring throughout all levels of the spine at the same time is unlikely in any of these patients. Rear end collisions are the most likely scenario for sprains and strains, mainly in the cervical region. Spinal ligament sprain/strain is diagnosed at all levels following all types of accidents, side impact, front and rear. Speed at moment of impact, one of the most important variables for injury is also not affecting outcome among these patients. MRI studies of the spine were performed in over 50 of the 55 records reviewed and no studies confirmed any spinal ligamentous injuries, no inflammation was seen, and no signs of recent or healing injury or fracture/dislocation of spinal bones among these patients. There were also no features of soft tissue injury or inflammation in the back area and near the bones of the spine, the vertebrae, on MRIs performed closest in time following these accidents. In the absence of any documented injuries to spinal ligaments, the diagnosis of spinal ligament sprains seen in chiropractor notes seems speculative and should not be listed as a diagnosis once MRI results were known.

ONGOING CARE AT SMART CHOICE MEDICAL

The frequency of acupuncture, chiropractic and physical therapy visits at Smart Choice Medical decrease after an initial 3-4 months at 3 times weekly. Visits remain on same calendar dates but at 2 times weekly with further reductions until visits may be as infrequent as one time monthly in some patients. This system of extending treatment with slow reduction is not supported by reports of patient improvement. Chiropractic care does include chronic management at longer intervals between visits but the benefits of this strategy for PT and acupuncture for young adults with no pre-existing spine disease is not seen in these patients .

All but 5 patients among the 55 reviewed Smart Choice Medical patients have MRI studies of the spine ordered at the initial physician encounter. In the vast majority of cases the entire spine is imaged with MRI during the first month post motor vehicle accident. It is not medically indicated to image the spine at these early dates unless suspicions are of fracture not visible on plain X-rays or perhaps seen but needing greater detail, vertebral dislocation or spinal cord injury. An additional consideration would be signs of nerve dysfunction on examination supporting injury at the spinal level. There are mostly mild and some moderate level of soft tissue injuries among these patients. Physical examinations reveal mainly reduced range of motion and muscle tenderness along the spine with no signs of nerve injury. There is no indication to order MRI of the entire spine at the initial visit. The heavy use of MRI in general at

**Page 4**

the first physician visit is a consistent finding in these records. MRI is utilized as first line option for virtually any areas that experience pain at the initial physician evaluation. Among these patients some are referred for up to 6 MRI studies regardless of the level of pain reported. MRI studies do not replace appropriate examinations in management of pain. There is also a role for plain x-ray in acute trauma rather than immediately ordering MRI of feet, ankles and elbows, for example.

SPINE MRI REPORTS

37 of the 55 cases reviewed, two thirds, are patients under the age of 40, 22 or 40% are 30 or younger. These patients had no history of ongoing spine symptoms prior to the motor vehicle accident. Large clinical studies of adults ages 18-70 indicate that 1 or possibly 2 intervertebral disc levels of the spine may have some degree of pre-existing degenerative disease. This is seen as a disc bulge or slight protrusions in 20% of adults ages 18-70 without a prior history of spine symptoms. As expected, the bulk of those with abnormalities are among the older patients. The Smart Choice Medical patients have more than 3 times this degree of spine abnormalities reported in patients under the age of 40. In addition, the number of levels of spine with reported abnormalities, as well as the number of disc spaces showing abnormalities is entirely inconsistent with the types of accidents these patients had. In general, findings on MRI seen following a mild to modest motor vehicle accident are pre-existing and not an acute finding from the accident. The number of spinal disc levels reported as abnormal among the Smart Choice Medical patients suggests the interpretation of MRIs is at an extremely low threshold for reporting abnormalities. Spinal discs do bulge in the absence of pathology. MRI reports indicating a disc is bulging without inclusion of the amount of the bulging measured in millimeters, leaves uncertainty as to whether this is actually an abnormality. It is not appropriate to report every spinal disc level with insignificant, non compressive bulges as signs of pathology and abnormality. Without prior studies for comparison it is conjecture to label these disc findings as new or accident related. One patient record includes an independent radiologist's review of spine MRI. There is significant disagreement with findings of the disc bulges and herniations contained in the original report. In fact, the reviewer felt the study was normal. This suggests a possible subjective component to the reported findings. Smart Choice Medical providers include MRI reported abnormalities as clinical diagnoses and these are added to the records as such. The reported abnormalities in the vast majority of patients are not accident related but preexisting.

In the record of one patient reviewed, a radiologist entered a new report on a spine MRI 17 days following the original report. This is a 30 year old patient and the change in the report added a finding of facet joint inflammation in the lumbar spine region. Facets are small joints between adjacent spine bones located along the sides that provide support and mobility. Three days following this change in the report, a nurse practitioner working for Metro Pain Specialists at Smart Choice Medical recommended facet joint blocks for this patient. It is extremely unlikely that a 30 year old will develop MRI visible facet joint inflammation in the lumbar region seen on MRI 3 weeks following a minor to modest side impact vehicular accident. Facet joint inflammation and arthritis is a chronic wear and tear outcome in older patients. In addition, the lumbar spine was not even among the areas of treatment focus for the patient and was not a

source of significant pain. Facet joint blocks, injections adjacent to the spine, were performed in the following month. No benefit from the blocks is reported in treatment notes subsequently. There are no notations in the record regarding reasons for the new report of the MRI.


PATIENT SELF ASSESSMENT QUESTIONNAIRES


Smart Choice Medical physicians incorporate multiple self assessment patient questionnaires into the patient records, completed by patients at times of follow up office visits. Although certainly seeming an important part of monitoring the treatment process, these assessments are not utilized in management strategies nor are there any record entries showing a review of results and incorporation into care. No adjustments, modifications or changes in management result from patient generated information. The templated check off style chart notes used by Smart Choice providers do not have adequate patient reported information. They do not demonstrate an understanding by the treating physician of patient concerns, needs, or wants as these are not charted. In combination with a lack of response to the patient completed questionnaires, this is another aspected of non adaptive patient care, known as scripted.

Although there is no demonstrated physician involvement in obtaining answers on questionnaires as well as no records showing incorporation of questionnaire information into patient treatment changes; the physicians billed for extended patient care time for patients to complete these. There are also no records of care team meetings regarding these patients and with the lack of adaptive treatment plans, this care model is referred to as a clinical silo. Every provider operates within a single domain without coordination of care. This is not an efficient or effective care model and is known to cause confusion and frustration for patients as often the information received from providers is inconsistent.


PAIN SPECIALIST CARE

Smart Choice Medical has pain specialists, Metro Pain Specialists by name, working at their office locations. The pain specialists include physician as well as nurse practitioners evaluating primarily for procedures in the management of ongoing pain. The pain providers obtain a medical history from the patients although it is incomplete in aspects expected in care for patients experiencing pain. Unexpectedly, there is an identical pre-scripted paragraph included in the history of the present illness of all the patients evaluated. It is entered into the records by physician and nurse practitioners practicing separately. In this paragraph is an explanation of what these pain providers feel is the mechanism behind whiplash injury, also called acceleration-deceleration or flexion-extension injury to the patient's spine. The pain specialists are contributing their opinion about spine injury occurring in each case before their evaluation. This is perpetuating the thinking that every patient has an injury to vertebral

**Page 6**

ligaments, intervertebral facet joints and discs without evidence of such. It is also a predetermination that each patient has the same spinal diagnosis. A far more frequent but overlooked mechanism of injury in these patients is strain of muscles adjacent to the spine.

The assumption that every patient has an identical mechanism of spine injury and that all have the same clinical outcomes is medically impossible. There are patients among this group of 55 who were pedestrians struck by slowly moving vehicles. Assumptions that a person struck by a vehicle has the same mechanism behind injuries as occupants inside vehicles striking other vehicles suggests an incomplete understandings of bodily injury. This is, however, how these patients are being managed, regardless of pain specialist.

Pain specialists, physician and nurse practitioners, are recommending procedures such as epidural steroid injections in cervical and/or lumbar spine, multiple vertebral facet blocks and spinal nerve branch blocks for patients. These patients are not presenting with signs or symptoms as indications for these procedures. Previously healthy young adults do not develop diffuse spinal facet syndrome, a degenerative arthritis of joints between vertebrae of the spine, in only the few weeks to months immediately following minor vehicular accidents. None of the patients receiving cervical or lumbar epidural steroid injections had treatments other than physical therapy, chiropractic spinal manual therapy and acupuncture. The large majority received medication trials only of ibuprofen or naproxen sodium and a muscle relaxant, cyclobenzaprine or baclofen as medications. Patients referred for cervical spine epidural steroids, an injection of steroids placed just outside the tissues lining the spinal cord, lacked signs of spinal cord dysfunction such as myelopathy, a compression of the spinal cord. Their histories and examinations also lacked signs of cervical radiculopathy, numbness and tingling radiating from neck down into the arm with weakness of specific arm muscles. Epidural steroid injections when performed for pain without clear neurologic signs have a low likelihood of benefit, far less than 50%. Performance of a procedure that has inherent risks to the procedure and a low likelihood of improving symptoms is not a recommended course of action.The American Academy of Neurology, the largest organization of neurology physicians world wide, has not endorsed cervical epidural steroid injections for years because of infrequent but dangerous complications from injections. Risk of injury and limited benefit is the basis for avoidance of this procedure. Lumbar epidural steroid injections are also not likely to provide sustained relief and often require a series of monthly injections. They should not be offered without definite neurologic signs and not offered to patients for pain alone. The frequency at which epidural steroid injections are provided at Smart Choice Medical,10 patients among 55, approximately 18%, is a much higher frequency than anticipated in patients after mild to moderate motor vehicle accidents. Metro Pain Specialists are mainly limited to procedural pain management, they rarely make medication recommendations for chronic pain. Medication management with avoidance of opioids is a large part of this type of chronic pain treatment. This is vastly underrepresented along with over represented procedural pain management in the records reviewed.

Smart Choice Medical charts utilize primarily check off pre-printed forms that are annotated with limited additional information. Metro Pain Specialists provide typed reports. In

the case of each the records of neurologic examinations are limited and have errors in content and organization. Neither is comprehensive in this regard.

Medial branch nerve block is a procedure generally performed by anesthesiologists specializing in procedural based pain management. The medial branches of the spinal nerves supply sensation to spinal facet joints, the joints between adjacent bones of the spine, the vertebrae. To block these nerves, fluoroscopy, live real time x-ray imaging is utilized for proper location of an injection needle. Typically a steroid and topical anesthetic are injected. This procedure is performed far more often than would be expected, in 10 records reviewed. The vast majority of these patients are young adults, previously healthy, therefore very unlikely to have multilevel facet disease and this was not seen on MRI.

MEDICATIONS PRESCRIBED FOR SMART CHOICE MEDICAL PATIENTS

Smart Choice Medical has at least 2 physician providers practicing at each office location. All of these providers prescribe medications for their patients in the same pattern. In nearly all cases, patients receive a prescription strength of either naproxen sodium or ibuprofen, Aleve or Advil are the over the counter brand names best known, and a muscle relaxant, cyclobenzaprine or baclofen. The reasoning behind using prescription strength as opposed to over the counter strengths of naproxen and ibuprofen as generics is unclear. There is insufficient clinical evidence to warrant the far greater cost of prescription strength as it does not provide consistently better benefit in acute or chronic pain. In addition to the above medications, all patients receive omeprazole, a proton pump inhibitor reducing stomach acid as prophylaxis for medication that can possibly cause gastrointestinal upset. Using omeprazole in this fashion is not a recommended use of proton pump inhibitors as these medications would be reserved for patients with upper gastrointestinal discomfort from ibuprofen or naproxen sodium. Additionally, I did not find a recommendation in the charts for taking the pain medications with food and not on empty stomach. Omeprazole is also available as over the counter Prilosec OTC or generics at lower strength but prescription strength is ordered by the physicians. Differences in cost are in the hundreds of dollars for each prescription monthly. Physicians all have also chosen the same doses of each medication and all utilize omeprazole unnecessarily at prescription strength. This appears more likely to be a predetermined practice plan, scripted not individualized and is not a best practice. As mentioned, the medication treatments remained the same in nearly all patients despite many having Metro Pain Specialists consulted in their care.

The use of customized topical creams containing combinations of medications including topical anesthetic, muscle relaxant, capsaicin and gabapentin for soft tissue injuries with musculoskeletal pain is not a recognized beneficial treatment option. Approximately 4 patients received blends of these medications into a topical cream for continued pain. Best evidence suggests that there may be a role for this treatment specifically in selected types of nerve related pain but not in patients having pain related to neck or lower back sources of pain. The cost of preparation of these compounds, thousands of dollars, and lack of support for benefit does not warrant prescribing to these patients. Many of the patients are prescribed lidocaine patches at a very high cost at 5% prescription strength while over the counter 4% in clinical studies provides

Page 8

comparable benefit for neck and lower back strains. In addition, the number of patches prescribed with the initial prescription is excessive as there are patients who will not benefit, have side effects or have a skin reaction and be unable to use these patches that cost several hundred dollars. Some of these treatments are billed at thousands of dollars for each prescription filling.

Diclofenac, a medication in the same category as ibuprofen and naproxen sodium, is prescribed as a topical gel for some patients, lidocaine, a topical anesthetic in ointment form for a smaller number. In reviewing these records there is not documentation in the chart explaining where it will be applied and why it is being prescribed. Topical diclofenac can in some patients be comparable in benefit to oral non-steroidal anti-inflammatory medication such as ibuprofen or naproxen sodium for neck and back pain acutely. There are also reports of diclofenac oral being better than ibuprofen and naproxen sodium for back pain. The reason to achieve less potential benefit of diclofenac by prescribing topically is unknown and not explained in records. Diclofenac gel is billed at $2000 to $3,000 per prescription to match what over the counter medications can provide for under $20 per month. This is not only a cost analysis concern as there is no charted reasoning for clinical decisions in these records or explanation for redundancy in treatment among Smart Choice Medical providers. Appropriate use of topical diclofenac gel would, for example, include patients not able to tolerate oral non-steroidal anti-inflammatory medications. The medical records do not have this information.

DURABLE MEDICAL EQUIPMENT

The role of some items of durable medical equipment in the management of mild to moderate strains or sprains of spinal areas is known. Utilization of cervical and/or lumbar pillows and heating pad would be anticipated. It would not be expected that 20 of 55 records reviewed include multiple additional, unanticipated items of durable medical equipment ordered for patients. In nearly 1/3 of the records reviewed, patients were ordered a cervical home traction device and a lumbar back support simultaneously. There is no medical reasoning as to why these devices are ordered or any reason at same time by all of the Smart Choice Medical physicians. Home cervical traction is not warranted in patients receiving PT and chiropractic treatments weekly. In addition, cervical traction is not of proven value in sprain/strain conditions in young adult patients. These patients are receiving multiple mechanical therapy sessions each week. Unsupervised home traction of the neck is not advisable. Braces and supports for regions of the spine are not recommended in patients with mild to moderate sprain/strain conditions. Range of motion is generally reduced and improved mobility the goal. Immobilization is not warranted. Additional medical equipment ordered on patients includes cervical spine braces including hard braces utilized in fractures, temperature controlled water circulating heating pads, egg crate mattresses, over the bed tables, bed boards and whirlpool units. This is equipment one sees utilized in spinal cord injured patients and patients following stroke with paralysis as opposed to young adults with mild to moderate soft tissue injuries. These patients did not indicate on questionnaires that they are spending their days in bed not ambulatory. Invoices demonstrate thousands of dollars billed for individual patients for this equipment.

Page 9

FUNCTIONAL ASSESSMENTS

Nearly 100% of the Smart Choice Medical records reviewed have entries generated from assessments of manual muscle testing and range of motion testing. In most instances these are performed in close time proximity to the initial physician visit and at times of follow up visits. Graphs of progress or lack thereof are generated from the entry of the results. Findings from the physician examinations are not utilized for this process, rather the patients are re-examined by a physical therapist and therefore billed again for the same examinations. In addition, the information in muscle testing as entered by the physical therapist is erroneous in numerous instances. Limb strength is entered at levels incompatible with being able to walk or raise arms in records of patients who are clearly able to do so. Lack of understanding of the muscle strength testing scales by the physical therapist undermines the validity of this data. The value of knowing how to use a muscle strength testing scale minimizes subjective results and provides objective data for tracking patient progress. These results have invalid entries and are not impacting patient progress as treatment is not adjusted.

ADDITIONAL TESTING REQUESTED

The contribution of additional testing in the management of patients is in hope of bringing a beneficial impact from results on care. There are a number of tests ordered on Smart Choice Medical patients falling short of this goal.

Seven Smart Choice Medical patients among the 55 reviewed underwent a test named computerized radiologic mensuration analysis, CRMA. This test is designed to demonstrate the alignment and mobility of the spinal bones, vertebrae, through x-ray image. This test procedure is endorsed by a limited number of radiologists and a larger volume of chiropractors. Results of this testing are being utilized to support diagnoses of spinal misalignment, ligament injuries and spinal instability. The majority of these tests are performed in the evaluation of patients involved in motor vehicle accidents and are ordered by chiropractors. To date this procedure has not gained general medical acceptance as the primary diagnostic option or found to be predictive in progressive or sustained spine structural disease. MRI of the spine remains the highest standard for the evaluation of disease of bone, discs and ligaments following trauma related to MVAs. It is also the most sensitive procedure for signs of soft tissue injury adjacent to the spine. Despite no signs of ligament or soft tissue injuries on MRI, all 7 of the Smart Choice Medical patients tested by CRMA had reports indicative of misalignment and stability abnormalities of their spines. The reports include terms and phrases suggesting these are significant findings. However, these patients had no specific changes made to the management plan following this test. The spine is tested as unstable by CRMA, but allows safe chiropractic manipulation and adjustments as these treatments continued in all 7 patients. This is because the MRI found no abnormalities precluding doing so. All of the patients had testing interpreted by a single radiologist who is also a proponent of the merits of the CRMA procedure.

**Page 10**

An additional referral test is trigger point impedance testing with intense nerve stimulation. This procedure is based on the presumption that unrecognized or persistent painful myofascial trigger points are present in muscles and not receiving effective treatment. An additional assumption is that small nerve fibers known to be active in mediating pain signal transmission have become over sensitized. A third assumption is that by further increasing the activity of these small nerve fibers, the resulting nerve response creates an analgesic effect. An initial impedance or skin resistance measuring process to localize trigger points is followed by a nerve stimulation process to attempt to alter nerve activity to reduce pain. A single Smart Choice Medical Chiropractor, referred 7 of the 18 patients he evaluated and treated for cervical and lumbar spine region pain for this procedure. The process includes 6 weekly sessions and in some cases additional sessions. Despite some claims of high success rates following this 2 part testing process, it did not provide any patient sustained benefit among Smart Choice Medical patients. Pain levels as reported by these patients were not significantly benefitted. This is a very expensive procedure costing over $2000 for each of 6 or more sessions but providing only a temporary, unsustained benefit following each session. Pre-printed, identical general information statements about the reasoning and usefulness of the testing are included in all of the tested patient records rather than specifics to a particular patient.

A small number of Smart Choice Medical patients underwent pain fiber nerve conduction studies performed under the premise that nerves with an increased response are indicative of sensitivity while a reduced response may somehow indicate a proximal nerve root abnormality. Unfortunately this procedure has not produced management strategies that demonstrate usefulness of the data and results are not universally accepted with medical certainty. Additionally, each nerve tested is billed individually.

Sixteen of 55, 29% of patient records reviewed had blood and urine testing for the purpose of toxicology testing. These were not preliminary screening procedures. Instead, upwards of 70 specific agents, from commonly prescribed medications to substances of abuse were tested for blood levels. Some patients had multiple tests over time despite the initial not having any findings. Among all these comprehensive tests, 3 patients had cannabinoids in urine, none showed any other findings. There are no chart entries explaining the purpose of ordering testing costing from $1000 to $5000 versus screening urine toxicology testing, the standard process, costing under $100. There are no chart entries as to the reason for these tests. Also, the records showing cannabinoids did not include inquiries or chart mention if the finding was related to medical marijuana use.

MEDICAL RECORDS

Both Smart Choice Medical facilities utilize pre-printed history and physical examination forms for the physicians to circle or checklist items. The choices circled or checked for each portion of the history and physical may be single or multiple. There are also small spaces for

adding a modest amount of additional information as providers feel necessary. At no point is the information from this brief check list form expanded into a comprehensive chart entry of history and physical. The histories are cryptic. History is limited to a patient being in a vehicle for example, wearing seat belt or not, where vehicle is struck, loss of consciousness yes or no, taken for immediate medical care yes or no. No information is recorded as spoken by the patient as to what actually happened on impact during MVAs. The preprinted note is limited to where is pain located and how severe is pain numerically on a scale from 0-10 along with the type of pain. Circled descriptions often indicate pain is sharp, dull, burning and throbbing without anything additional asked about the circumstances for such. There are multiple unaddressed questions regarding pain location, situations worsening or alleviating pain, establishing duration of individual episodes of pain, time of day most impacted by pain, and the effect of any medications taken for pain. Past medical histories of ongoing or prior conditions including medications taken and surgeries are noted without adequate details. Physical examinations are also briefly charted and are not indicative of the comprehensive level of physical examination at which they are invoiced. One striking element missing is a description of the patient gait and coordination and a description of any bodily signs of physical injury from these accidents that are very frequently less than a week old. There is also no recorded assessment of the appearance of body parts such as abdomen, chest, and head for bruises or anything additional. These notes are perhaps adequate as a template but without a full medical note produced subsequently, they provide less than what is expected of medical providers. However, they are invoiced as comprehensive initial visits with a new patient. The same style notes are used for subsequent visits as well and do not provide an adequate interim summary of the impacts on patients of ongoing treatments. All notes reviewed have inadequate medical reasoning for the management decision making. The plans at follow up visits are a repetition in all records of the ongoing identical script for care, acupuncture, chiropractor, PT, outcome assessment testing, medications as prescribed previously.

ELECTROMYOGRAPHY AND NERVE CONDUCTION VELOCITY TESTING

The 2 part procedure Electromyography (EMG) and Nerve Conduction Velocity testing (NCV) is second only to MRI in frequency of testing among the 55 Smart Choice Medical records reviewed. Forty patients undergo testing, nearing 75% of the patients reviewed. NCV testing is the first portion of the testing, using electrical impulses applied to the skin over individual nerves in arms or legs and measuring the response from the nerve below. EMG is the other part of the procedure. A thin, sterilized, disposable recording needle is inserted through skin into a muscle below. Each muscle is studied separately as the needle is moved a few millimeters within the muscle to different areas to record electrical activity. The testing physician views the electrical activity on the screen of the testing equipment.

The volume of EMG/NCV testing among Smart Choice Medical patients reviewed is far greater than anticipated for this group. As stated repeatedly, young and previously healthy patients would not be expected to undergo testing at a high frequency. In addition, 30 of the 40 patients tested had 4 limb studies. That means 3/4 of the patients tested had 4 limb studies. This is more than 10 times the number of 4 limb studies generally performed. In addition, the vast majority of these patients had neck and/or lower back pain as the only symptoms. They lacked

signs or definitive symptoms from a pinched nerve in either cervical or lumbar sacral spine, radiculopathy. It is expected that the number of 4 limb studies would be extremely small, approximately 3, because so many of these patients are without pre-existing spine conditions or prior injuries and had only minor or at most modest injuries to soft tissue in motor vehicle accidents.

Prior to the performance of EMG/NCV testing, all patients referred for the procedure should undergo an initial clinical evaluation. Both Physical Medicine and Rehabilitation (PM&R) physicians and neurologists perform EMG/NCV testing. The major educational and certifying organization for this testing is the American Association of Neuromuscular and Electrodiagnostic Medicine, AANEM. AANEM has established standards and best practices in EMG/NCV testing and disseminates this information for the education of physicians learning and those already performing the test procedures. This is to ensure quality tests with meaningful and accurate test reports are produced. Organization leaders as well as members of AANEM are from both neurology and PM&R. The purpose of the initial evaluation prior to EMG/NCV testing is to determine what aspects of the patient's medical history and findings on examination support the usefulness of performing the test procedure. Knowing what can be learned from doing the test for contributions to patient's management is paramount. An additional reason for this evaluation is test design, recognizing which nerves and muscles should be tested for a study to potentially support or not be consistent with a particular diagnosis. The evaluations performed by the EMG/NCV physicians of Smart Choice Medical often do not meet the standards as set by the AANEM.

(The appendix of this report contains links to publications released by AANEM or published in the organization's monthly journal, *Muscle and Nerve*. These pertain to the design and performance of EMG/NCV studies as well as specifics of testing in patients with suspected radiculopathy.)

The clinical examinations performed prior to EMG/NCV testing by Smart Choice Medical use preprinted forms with general statements about clinical usefulness of EMG/NCV testing. However, the reports do not include reasoning as to why this particular patient should have this test performed at the time of the evaluation. Listing possible diagnostic considerations without specifics falls short of goal. The proper evaluation completed before testing is called an electrodiagnostic evaluation, an interaction to determine if a patient will potentially benefit from the information obtained by doing the EMG/NCV study. Another reason for the evaluation is for the testing physician to determine what nerves and muscles should be included in the test procedure for this patient. The evaluation report should summarize where the suspected ongoing process is located including nerve level(s) of spine involved and what nerves and muscles will specifically be included in the test to confirm this. Findings of the examination performed should be referenced specifically within the planned testing.

Page 13

EMG/NCV TESTS OF SMART CHOICE MEDICAL PATIENTS

Determining correct timing to perform EMG/NCV testing is of critical importance in patients undergoing this procedure. Smart Choice Medical patients are being referred for testing primarily for symptoms from the neck and/or lower back. The study will not show abnormalities if the clinical condition is purely muscle related, such as painful muscle strain. In the evaluation of neck or lower back signs of possible radiculopathy, a pinched or compressed nerves from the spine, abnormalities will not appear immediately. There is an evolution of findings on EMG testing of muscles that do not begin to appear until a minimum of 3 and often times 4 weeks has passed. Therefore EMG performed at 1 month after onset is too soon and waiting at least 6 weeks increases the likelihood of meaningful test findings. Nine of the 40 tests, over 20%, ordered by Smart Choice providers are completed early after the MVAs, some at less than 1 month. An additional 4 cases are performed at or around the earliest time and could have limited findings. This definitely reduces the likelihood of a diagnostic EMG/NCV study for these 13 patients.

The expectation in reviewing the EMG/NCV testing is that the number of nerve studies is consistent with the clinical conditions being considered. In the evaluation of the upper extremities for possible radiculopathy, 2 sensory nerves and 3 motor nerves warrant testing. Lower extremity studies for radiculopathy include 2 H reflex tests as well as 2 sensory and 3 motor nerves. EMG is performed on the primary symptomatic limb and perhaps extended to include muscles from the opposite side. A full limb of EMG testing includes 6 muscles per limb and 4 levels of muscles adjacent to the spine. Limited limb EMG testing, fewer muscles in 1 or more limbs is an option as well. All of the Smart Choice Medical patients' EMG/NCV studies are identical in the number and specific nerves tested. There is no compliance with guidelines for volume or adjustment of the procedure based on the pre-test clinical assessment. An upper extremity study is the same 6 sensory nerves, same 4 motor nerves and 2 limbs studied by EMG needle. All lower extremity studies have the identical 4 sensory and 4 motor nerves, 2 H reflexes and 2 lower limbs of EMG. A four limb Smart Choice Medical study therefore includes 10 sensory nerves, 8 motor nerves, 2 H reflexes and 4 limbs of EMG including muscles adjacent to the spine. The AAENM has published guidelines for volume of testing and statements pertaining to excess testing as these studies incorporate. (See Appendix) AANEM guidelines would recommend 8 fewer nerve studies in evaluating radiculopathy in both upper and lower extremities. All of the additional nerves tested in these cases are submitted for payment.

Needle EMG testing of 40 muscles, 4 full limb studies, is an extensive undertaking and not recommended. The needle must be moved a few millimeters inside muscle to place the recording needle tip nearest desired electrical activity. The examiner observes recorded electrical muscle fiber activity on a computer screen. It is time consuming to perform a 4 limb EMG/NCV study and painful to patients. AANEM guidelines recommend utilizing limited limb EMG in cases not demonstrating abnormalities in the limbs of greatest likelihood for abnormalities. Smart Choice Medical did not utilize limited EMG for any patient.

Page 14

NCV studies of 20 nerves including the set up of recording electrodes for each of the studies will take approximately 45 to 60 minutes. Nerve studies can be performed by a trained technician with results recorded and printed for physician review. The physician should be present during the nerve studies for assistance when necessary. The EMG portion of the test is physician performed and a study of 40 muscles completed correctly will require at least an hour. The Smart Choice Medical patients 4 limb studies are very large studies and would not easily be completed within less than 2 hours. Additionally it is expected that the physician has fully reviewed the NCV data prior to beginning EMG testing. It is anticipated that the initial evaluation and testing of these patients is scheduled for a minimum of 2.5 hours, possibly requiring longer.

There are a number of NCV results among the Smart Choice EMG/NCV studies that are erroneous and were not addressed by the testing physician. As a result there is data in the report of 4 of studies reviewed showing a number of nerves conducting at rates of 2-3 times faster than possible. Also, 2 studies include incorrect measurements of the size of the responses from nerves. These errors, in 15% of the reports, are indicative of insufficient review of the NCV data by the testing physician and perhaps inadequate time allotment for this process. (Appendix)

The physicians performing EMG and completing the EMG/NCV reports for Smart Choice Medical patients are not adequately aware of the test findings necessary to support a diagnosis of radiculopathy. These criteria are readily available through the AANEM (Appendix) and are well known among experienced testing physicians. A single abnormal muscle demonstrating minimal abnormalities is not an adequate diagnostic finding. Smart Choice Medical physicians provided reports with a diagnosis of radiculopathy on 18 occasions with inadequate findings to support that impression in 15 of these. Only 3 studies reviewed supported that diagnosis. Three patients were found to have studies supportive of carpal tunnel syndrome, not unusual in a group of 40 tests.

It is expected that the contribution of EMG/NCV studies would be minimal in a group largely made up of previously healthy young adults, often undergoing the test procedure at approximately only 1 month post motor vehicle accident. The charges billed for a 4 extremity EMG/NCV study are over $3000. Unnecessary, additional nerve testing contributes over $950 to the charge of a 4 limb study. Cost versus benefit of the EMG/NCV procedures reviewed shows this test procedure was of minimal to no benefit as the 3 patients with radiculopathy had a clinical diagnosis prior to the study and no treatment changes introduced following the study completion.

## CONCLUSION

Comprehensive quality health care is guided by a patient's needs. It is an individualized, adaptive process utilizing collaborative efforts with meaningful changes to a plan of care when indicated. Redundant, rigid care that follows a pre-determined pattern regardless of outcome,

**Page 15**

including unnecessary steps, is non effective patient management. This type of care, as identified at Smart Choice Medical, interferes with achieving good clinical results for these patients. The additional presence of extraordinary high cost to insurance and potentially patients raises additional concerns. In this report of Smart Choice Medical record reviews are numerous instances of scripted, ridged care with resultant negative impact on patients. Additionally, a number of procedures that are clinically not impactful or warranted are identified along with questionable strategies of care. The absence of true outcome reviews with adjustments further adds to the poor results for patients.


Sincerely,

Mark A. Kaufman, MD

MAK/da


APPENDIX:

https://www.aanem.org/Advocacy/Position-Statements/Recommended-Policy-for-Electrodiagnostic-Medicine_.pdf

https://www.aanem.org/getmedia/98c06e76-bca5-4b8c-97f5-50fe1629b635/Proper-Performance-of-EDX_1.pdf

https://www.aanem.org/mxonline/resources/downloads/products/TC08-Manuscript_Patients_with_Suspected_Radiculopathy.pdf

https://www.aanem.org/getmedia/08aa98cf-cb01-47f8-8a70-4f7feef7f07c/cervicalRadiculopathy.pdf

https://www.aanem.org/getmedia/78ef9196-fac8-475f-ac26-9331d16cdc23/Utility-of-Elec-Testing_Reaffirmed.pdf

# Exhibit B

# Mark A. Kaufman, M.D.
**Board Certified in Neurology, Member of American Academy of Neurology**
**Board Certified in Electromyography**

152 East Main Street • Suite E • Huntington • NY 11743 • Tel: 631-351-1717 • Fax: 631-351-7038

October 18, 2022

**SMART CHOICE MEDICAL, P.C. PART 2 REVIEW**

## PURPOSE OF THE REPORT
In response to subsequent request from the U.S. Attorney's Office, I have reviewed an additional 45 records of patients treated between 2016 and 2019 by healthcare providers of Smart Choice Medical, P.C. These records have had comprehensive review with parameters being the same as those in the initial report. These include the entire records being reviewed inclusive of treatments, consultations, laboratory and diagnostic testing as ordered.

## SUMMARY OF FINDINGS:
The details of the patient group of 45 as compared to the initial group of 55 patients note a higher percentage of older patients in the more recently reviewed group of 45. Specifically, this group includes 19 individuals greater than the age of 50. As a result, there are a far larger number of patients with concomitant additional medical diagnoses independent from reported injuries related to vehicular accidents. As a result of other medical conditions, in nerve conduction velocity testing; there are a higher number of patients with a testing diagnosis of peripheral neuropathy than seen in the review of the original 55 patients. This diagnosis is not related to the vehicular accidents that these patients experienced. This group of patients, 45 in total, was involved in minor to moderate motor vehicular accidents. Treatment patterns, structure of care, therapies provided as well as diagnostic testing are in the same pattern as reported in the initial report. These patients are entered into chiropractic and acupuncture treatments at their initial visit with Smart Choice Medical and are treated in the pattern identified in the earlier report. All patients undergo chiropractic adjustments, as well as acupuncture treatment on three times a week schedule, beginning at their initial visit. The arrival of patients for initial visits is soon after the vehicular accident, at times on the same day.

## INITIATION OF CARE AT SMART CHOICE MEDICAL
Patients arrive to Smart Choice medical without an apparent referral, as there is no report or letter generated to a provider as having referred these patients to the practice.

The patterns of treatment, initially acupuncture and chiropractic treatments expand to include physical therapy following the physician evaluation. The timing of these and the frequency are also in the identical pattern to that as reported in the earlier report. All begin 3 times per week, all occurring on the same days.

**SMART CHOICE MEDICAL, P.C.**
**Page 2**

The listed diagnoses for all patients seen by chiropractic physicians as noted in the earlier report include multilevel ligamentous sprain. All medical physician providers request multiple MRI studies of spine at the initial evaluation.

Ongoing care continues to include months of acupuncture, chiropractic and physical therapy visits at Smart Choice Medical with reduction in visits per week after the initial three to four month time period. Typically this transitions to two-times-weekly.

MRI studies continue to show an extraordinarily high percentage of patients with multilevel cervical and lumbar sacral degenerative disease of discs reported as bulges or herniations in virtually every patient, sometimes at more than 4 contiguous levels of vertebrae.

**PATIENT SELF-ASSESSMENT QUESTIONNAIRES:**
As noted in the previous review, the use of patient completed questionnaires is seen in these charts as noted on the earlier review without evidence of incorporation into the treatment plan.

**PAIN SPECIALISTS CARE**
Following the initial period of mechanical therapies as described, patients are referred to Metro Pain Specialists and/or sent for additional diagnostic testing. The pain specialists primarily perform epidural injections or medial branch nerve blocks. There are other patients who receive spinal facet specific injections. It is noted that patients as young as 18 years of age are being diagnosed with a spinal facet syndrome and are treated with facet injections. This diagnosis is often made within a short period of time following these mild or moderate motor vehicle accidents. This condition is a degenerative condition that develops over time in adults and would neither be expected nor to be a focus of therapy in teenagers with no prior history and minor to moderate musculoskeletal complaints following a vehicular accident.

**TREATMENTS FOR SMART CHOICE MEDICAL PATIENTS**
Smart Choice Medical patients are typically treated with anti-inflammatory medications and muscle relaxants. All patients receiving anti-inflammatory medication are given prophylactic omeprazole as noted in the prior review. This is not an automatic recommendation typically provided for protection of the gastrointestinal system.

Customized topical treatments, as well as topical diclofenac are also seen in the group of 45 patients with a very high cost as noted in the earlier without documentation or indications included for topical use

**DURABLE MEDICAL EQUIPMENT**
Durable medical equipment referrals are excessive in the group of 45 patients, as noted previously. Cervical traction devices and collars for the cervical region and supports and

**SMART CHOICE MEDICAL, P.C.**
**Page 3**

braces for the lumbar sacral region along with mattresses, heating pads, whirlpool all as noted in the earlier reviewed records.

## ADDITIONAL TESTING
Patients among the 45 are sent for computerized radiologic mensuration analysis. Again, this highly specialized testing is not recognized to be superior to the MRIs that were ordered on all of these patients. In addition, no intervention or therapy is provided based on these test results. Every patient evaluated with CRMA, (computerized radiologic mensuration analysis) is reported as having serious structural spine disease. The likelihood that a group of young adults would acquire unstable spines from rear-end, low velocity often bumper-to-bumper vehicular impact is not possible. The likelihood that every patient having this test has the same abnormalities is also not possible.

## TOXICOLOGY TESTING
Patients are sent for quantitative blood levels of multiple agents of abuse and prescription medications costing thousands of dollars in lieu of screening tests. This quantitative process continues in patients who have had multiple negative tests over time.

## ELECTROMYOGRAPHY AND NERVE CONDUCTION VELOCITY TESTING
EMG and NCV testing is performed at an extremely high frequency in the group of 45 patients as well. This rate is similar to that as noted in the original group of records reviewed. All patients with the exception of two had four-limb studies with the identical testing features as noted in the earlier study. All patients have 10 sensory nerves tested, 8 motor nerves tested and 4 limbs of EMG tested; most testing is done at one month following the vehicular accident. The extent of testing is not clinically indicated from the charts reviewed. The expectation of finding abnormalities one month following a motor vehicle accident is at an extremely low percentage in this patient population group. In fact, most of the findings are for unrelated abnormalities such as carpal tunnel syndrome and peripheral neuropathy. As noted in the earlier report, the volume of studies is not consistent with the recommendations of the American Association of Neuromuscular and Electrodiagnostic Testing.

## CONCLUSION
Despite the appearance of a very comprehensive health care process at Smart Choice Medical, it is in fact only a script of health care that is not tailored to patient needs, does not provide adaptations for patient individuality of symptoms and findings, and is not designed for the best outcome for patients.

As noted in the earlier review, the evaluation and management plan at Smart Choice Medical provides prolonged, expensive and ineffective health care. It appears that the purpose of additional testing is to supplement ongoing scripted care that has no endpoint in mind as tests and procedures are ineffective add ons not individualized to goals for care.

**SMART CHOICE MEDICAL, P.C.**
**Page 4**

Patients do not improve in an anticipated timeframe and the continuing care process appears to be a means of justification to continue a care plan that has already proven not to be successful.  At no time do the providers at Smart Choice Medical assess the lack of benefit from their care plan and make changes for the benefit of the patients. Patients are instead sent for more expensive testing and consultations and this results in a longer ineffective care plan.  The only patients that leave treatment with Smart Choice Medical are those who have their care denied by their automobile insurance providers.

*I, Mark A. Kaufman, M.D., being a physician duly licensed to practice in the State of New York, under penalties of perjury pursuant to CPLR section 2106, do hereby affirm the contents of the foregoing to be true.*

Very truly yours,

Mark A. Kaufman, MD

MAK/df

# Exhibit C

## CURRICULUM VITAE

### PERSONAL

| | |
|---|---|
| **Name:** | Mark A. Kaufman, M.D. |
| **Work Address:** | 152 East Main Street<br>Suite E<br>Huntington, NY 11743 |
| **Work Telephone:** | (631)351-1717 |
| **Home Address:** | 2 Susan Terrace<br>Northport, NY  11768 |
| **Home Telephone:** | (631) 754-3343 |
| **E-mail:** | mak1155@optonline.net |
| **Date of Birth:** | 11/23/1955 |
| **Place of Birth:** | New York, NY |

APPOINTMENTS

Clinical:

Chief of Staff
VAMC Northport, NY
1/2016 - 12/2017

Chief, Neurology Service
VAMC Northport, NY
11/1994 - 1/2016

Associated Chief of Staff for Education
VAMC Northport
7/2011- 12/2017

Education Coordinator
Designated Education Official
VAMC Northport, NY
7/2002 - 12/2017

Director of Neurophysiology
VAMC Northport, NY
7/1992 - 1/2016

Acting Chief Neurology Service
VAMC Northport, NY
3/1994 - 11/1994

Assistant Chief,
Neurology Service
VAMC Northport, NY
8/1993 - 3/1994

Director Neurology
Residency Program
Department of Neurology
SUNY-Stony Brook
1/1999 - 7/2004

Associate Director
Neurology Residency Program
Department of Neurology
SUNY-Stony Brook
7/1994 - 12/1998

Director, EMG Laboratory
Department of Neurology
SUNY-Stony Brook
7/1992 - 6/2001


Assistant Attending   11/1988 - 6/1992
Junior Attending      7/1987 - 10/1988
Department of Neurology
Nassau County Medical Center
East Meadow, NY

Director of Evoked Potential Laboratory
Nassau County Medical Center
7/1987 - 6/1992

Chief, Division of Neurologic Research
Department of Neurology
Nassau County Medical Center
7/1987 - 6/1992

Academic:        Associate Professor of Clinical Neurology
                 SUNY-Stony Brook
                 10/1996 - current


                 Assistant Professor of Neurology
                 SUNY-Stony Brook
                 5/1992 - 10/1996

                 Assistant Professor of Clinical Neurology
                 SUNY-Stony Brook 4/1988 - 5/1992


                 Assistant Instructor of Clinical Neurology
                 SUNY-Stony Brook
                 7/1983 - 6/1984

Other:           Private Practice - Neurology
                 Dover, NJ  Dover General Hospital
                 7/1984 - 6/1987

MEDICAL LICENSURE

New York              1980                    #144624

AFFILIATIONS

Member                American   Academy   of   Neurology   -   Active

BOARD CERTIFICATION

            American Board of Psychiatry and Neurology,
            Neurology  1985

            American Board of Electrodiagnostic
              Medicine  1989

POST GRADUATE TRAINING

Residency:            Neurology
                      Nassau County Medical Center
                      East Meadow, NY
                      University Affiliation SUNY-Stony Brook
                      7/1981 - 6/1984

                      Internal Medicine
                      East Tennessee State University
                      College of Medicine
                      Johnson City, TN
                      7/1980 - 6/1981

                      Internal Medicine
                      Miriam Hospital
                      Brown University
                      Providence, RI
                      7/1979 - 6/1980

EDUCATION


Graduate:                   Albany Medical College
                            Albany, NY
                            Doctor of Medicine 5/1979


Undergraduate:              Rensselaer Polytechnic Institute -
                            Albany Medical College Combined Curriculum
                            Bachelor of Sciences (Biology) 5/1979
                            Cum Laude



PUBLICATIONS

Articles:

Patel Y, Pinkert HW, Kaufman MA: Value of MRI in the evaluation of
    patients with seizures: An illustrative case. The Internet
    Journal of Neurology 2007;7.

Nasr J, Kaufman MA: Electrophysiologic findings in two patients
with digital neuropathy. Electromyography and Clinical
Neurophysiology, 2001;41:353-356.

Kaufman MA: Differential diagnosis and pitfalls in
    electrodiagnostic studies and special tests for diagnosing
    compressive neuropathies. Orthoped Clin North Amer
    1996;27:245-252.

Kaufman LD, Kaufman MA, Krupp LB: Movement disorders in the
    eosinophilia myalgia syndrome (EMS): tremor and myoclonus:
J
    Rheumatol 1995;22:157-160.

Kharode C, McAbee G, Sherman J, Kaufman M: Familial intracranial
    hypertension: Report of a case and review of the
literature.
    J Child Neurol 1992;7:196-198.

Kaufman MA, Bhargava A: Dietary weight reduction and seizures.
    Neurology 1990;40:1905-1906.

Kaufman M, Little BW, Berkowitz BW: Recurrent intracranial hemorrhage in an adult with moyamoya disease: case report,
    radiographic studies and pathology. Can J Neuro Sci 1988;15:
    430-434.


Texts:

Kaufman MA:  Neuromuscular Disorders, Ethanol Intoxication and Withdrawal, Heat Injury and Hyperthermic Syndromes, Kruse J et al
eds:  Pocket Companion to Principles and Practice of Medical Intensive Care. Philadelphia, WB Saunders Company, 1995.

Coyle PK, Kaufman MA:  Lyme Neuropathy, in Kelly JJ et al eds: Immunologic and Infectious Diseases of Peripheral Nerves. New York, Cambridge University Press, 1997.


Ad Hoc Reviewer, Neurology, 1999 - 2008




ABSTRACTS
                    Edema Changes as a Cause of Carpal Tunnel
                     Syndrome.  Orthopaedic Research Society;
                     Atlanta, Georgia 1996

                    Carpal Tunnel Syndrome, Volume and
                     Neurophysiological Changes in Dialysis
                     American Society of Nephrology; 1995

                    Reduction of Seizure Threshold in Rats
                     by Very Low Calorie Diet
                    American Academy of Neurology Annual Meeting
                      1990

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------x

UNITED STATES OF AMERICA, Docket No.

                                         22 Cr. 20 (PGG)
        -against-

                                         DECLARATION OF

PETER KHAIMOV,      PETER KHAIMOV

        Defendant.

-----------------------------------------x

PETER KHAIMOV, pursuant to Title 28, United States Code, section 1746, hereby declares under penalty of perjury:

1. I am the defendant in the above-captioned matter. I submit this Declaration pursuant to footnote 2 of the Plea Agreement dated November 1, 2023, which requires a "financial affidavit" as to my current finances and a "property affidavit" as to sales, transfers, or gifts of property I or an entity under my control made during the last five years.

### CURRENT FINANCES

2. As to my current finances, I am 50% owner of A&P Rockaway,

   LLC, which owns property at 407 & 409 Rockaway Avenue, in Brooklyn.

3. I have a checking account at Metro City Bank, with approximately $5,000.00 on deposit, but the account is presently frozen.

4. I own a 2021 Toyota Sienna, valued at approximately

   $40,000.00.

5. I own a Rolex watch, valued at approximately $20,000.00.
### TRANSFERS OF PROPERTY

6. I transferred money to 5 Continental Ventures, LLC, for the purchase of property in Queens, New York, for $10.6 million, in September 2020.

7. I transferred money to 441 Willis Avenue, LLC, for the purchase of property in Bronx, New York, for $5.2 million in September 2021.

8. La Vie Jewels of NY, LLC, purchased property in Queens, New

   York, in February 2021, for $2.1 million. It was donated to ETZ HAIM, a non-profit organization.

9. I transferred money to 214 Jamaica, LLC, for the purchase of property in Queens, New York, in July 2021, for $2.85 million.

10. I transferred money to 93 Everton, LLC, for the purchase of property in Queens, New York, in January 2020.

11. I transferred money to 91 Park, LLC, for the purchase of properties in Queens, New York (91-08 & 91-10 63rd Drive) in April 2019, for $1.5 million.

12. I transferred money to 91 Rego, LLC for the purchase of property in Queens, New York (91-12 63rd Drive), in April 2019, for $1.3 million.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:    Queens, New York
          November 15, 2023

_____PETER KHAIMOV

Signed and sworn to before me on this the 15th day of November 2023.

ARNOLD BARAKAYEV
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BA6389483
Qualified in Nassau County
My Commission Expires 05-05-2027

# Exhibit E

COURT'S
EXHIBIT NO. _____ 1
IDENTIFICATION/EVIDENCE
DKT.# _____
DATE: _____

MGD/DGR:AJE
F. # 2020R01145

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA                  PLEA AGREEMENT

       - against -
                                          20 CR 580 (S-1) (AMD)
PETER KHAIM,

              Defendant.

– – – – – – – – – – – – – – – –X

      Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York and the United States Department of Justice, Criminal Division, Fraud Section (collectively, the "Office") and PETER KHAIM (the "defendant") agree to the following:

      1.    The defendant will plead guilty to Count Two of the above-captioned superseding indictment (the "Indictment"), charging a violation of 18 U.S.C. § 1956(h). The count carries the following statutory penalties:

        a.    Maximum term of imprisonment: 20 years
            (18 U.S.C. §§ 1956(h), 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i)).

        b.    Minimum term of imprisonment: 0 years
            (18 U.S.C. §§ 1956(h), 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i)).

        c.    Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision
            (18 U.S.C. §§ 3583 (b) & (e)).

      d.     Maximum fine:  Greater of $500,000, or twice the value of the property involved in the transaction or twice the value of the monetary instrument or funds involved in the transportation, transmission or transfer
(18 U.S.C. §§ 3571(b)(1), 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i)).

      e.     Restitution:  Mandatory in the amount of $18,921,139.21, to be paid to Medicare
(18 U.S.C. §§ 3663A and 3664).

      f.     Civil money penalty: Not more than the greater of the value of the property, funds or monetary instruments involved in the transaction or $10,000
(18 U.S.C. § 1956(b)(1)).

      g.     $100 special assessment
(18 U.S.C. § 3013).

      h.     Criminal forfeiture, as set forth in paragraphs 6 through 13 below
(18 U.S.C. §§ 982(a)(1) and 982(b)(1) and 21 U.S.C. § 853(p)).

      i.     Other penalties: Denaturalization and removal, as set forth in paragraph 15 below; exclusion from Medicare, Medicaid and all federal health care programs, as set forth in paragraph 14 below.

      2.     The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case.  The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence.  See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  The Office

estimates the likely adjusted offense level under the Guidelines to be 36, which is predicated on

the following Guidelines calculation:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2S1.1(a)(2)) | | 8 |
| Plus: | Laundered funds more than $9,500,000 (U.S.S.G. §§ 2S1.1(a)(2), 2B1.1((b)(1)(K)) | +20 |
| Plus: | Conviction under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B)) | +2 |
| Plus: | Sophisticated laundering (U.S.S.G. § 2S1.1(b)(3)) | +2 |
| Plus: | Leader or organizer (U.S.S.G. § 3B1.1(a)) | +4 |
| Total: | | 36 |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and

subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted,

pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 34 and a range of

imprisonment of 151 - 188 months, assuming that the defendant falls within Criminal History

Category I. Furthermore, if the defendant has accepted responsibility as described above, to the

satisfaction of the Office, and if the defendant pleads guilty on or before November 3, 2022, an

additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an

adjusted offense level of 33. This level carries a range of imprisonment of 135 - 168 months,

assuming that the defendant falls within Criminal History Category I. The defendant stipulates

to the above Guidelines calculation, except as to the applicability of § 3B1.1. The defendant

further agrees not to argue, under either the Sentencing Guidelines or 18 U.S.C. § 3553(a), for a

sentence below 87 months or for a non-custodial sentence.

      3.      The Guidelines estimate set forth in paragraph 2 is not binding on the

Office, the Probation Department or the Court. If the Guidelines offense level advocated by the

Office, or determined by the Probation Department or the Court, is, for any reason, including an

error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4.      The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 135 months or below.  This waiver is binding without regard to the sentencing analysis used by the Court.  The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn.  The defendant further waives the right to raise on appeal or on collateral review any argument that (a) the statute(s) to which the defendant is pleading guilty is unconstitutional and (b) the admitted conduct does not fall within the scope of the statute(s).  Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.  The defendant waives any right to additional disclosure from the government in connection with the guilty plea.  The defendant agrees that with respect to all charges referred to in paragraphs 1 and 5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law.  The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

5.      The Office agrees that:

   a.      no further criminal charges will be brought against the defendant for conspiracy to commit health care fraud and wire fraud, conspiracy to commit money laundering and money laundering, for the period from in or about October 2018 to December 2020, as charged in the Indictment, it being understood that this agreement

4

does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq., and at the time of sentence, it will move to dismiss the remaining counts of the Indictment and the underlying indictment with prejudice;

and, based upon information now known to the Office, it will

    b.  take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and

    c.  make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraphs 5(b) and 5(c). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to: (a) moving for the additional one-level downward adjustment for timely acceptance of responsibility described in paragraph 2 above; and (b) the provisions of paragraphs 5(a)-(c).

    6.  The defendant acknowledges that he obtained and/or acquired property that is subject to forfeiture as a result of his violation of 18 U.S.C. § 1956(h), as alleged in the Indictment. The defendant consents to the entry of a forfeiture money judgment in the amount of two million seven hundred fifty-three thousand one hundred twenty-nine dollars and zero cents ($2,753,129.00) (the "Forfeiture Money Judgment"). The defendant agrees that the amount of the Forfeiture Money Judgment and any payments toward the Forfeiture Money Judgment represent property, real or personal, involved in his violation of 18 U.S.C. § 1956(h), or any property traceable to such property and/or substitute assets, and thus are forfeitable to the United States pursuant to 18 U.S.C. §§ 982(a)(1) and 982(b)(1) and 21 U.S.C. § 853(p), in any

administrative and/or judicial (civil or criminal) proceeding(s) at the Office's exclusive

discretion.  The defendant consents to the entry of an Order of Forfeiture, pursuant to Rule 32.2

of the Federal Rules of Criminal Procedure, imposing the Forfeiture Money Judgment.

7.    The Forfeiture Money Judgment shall be paid in full 30 days in advance of

sentencing (the "Due Date").  All payments made by the defendant toward the Forfeiture Money

Judgment shall be made by money order, certified check and/or official bank check, payable to

the "U.S. Marshals Service."  The defendant shall cause said payment(s) to be sent by overnight

mail delivery to Assistant United States Attorney Claire S. Kedeshian, United States Attorney's

Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201,

with the criminal docket number noted on the face of the instrument.  The defendant consents to

the restraint of all payments made toward the Forfeiture Money Judgment.  The defendant also

waives all statutory deadlines, including but not limited to deadlines set forth in 18 U.S.C. § 983.

8.    If the defendant fails to pay any portion of the Forfeiture Money Judgment

on or before the Due Date, the defendant consents to the forfeiture of any other property of his

up to the amount of the unpaid Forfeiture Money Judgment, pursuant to 21 U.S.C. § 853(p), and

further agrees that the conditions of 21 U.S.C. § 853(p)(1)(A)-(E) have been met.

9.    The defendant agrees to fully assist the government in effectuating the

payment of the Forfeiture Money Judgment, by among other things, executing any documents

necessary to effectuate any transfer of title to the United States.  The defendant agrees not to file

a claim or petition seeking remission or contesting the forfeiture of any property against which

the government seeks to satisfy the Forfeiture Money Judgment in any administrative or judicial

(civil or criminal) proceeding.  The defendant further agrees not to assist any person or entity in

the filing of any claim or petition seeking remission or contesting the forfeiture of any property

against which the government seeks to satisfy the Forfeiture Money Judgment in any administrative or judicial (civil or criminal) forfeiture proceeding.

10.    The failure of the defendant to forfeit any monies and/or properties as required under this agreement, including the failure of the defendant to execute any document to accomplish the same on timely notice to do so, may constitute a material breach of this agreement. Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant.

11.    The defendant represents that he will disclose all of his assets to the United States on the financial statement entitled "United States Department of Justice Financial Statement" (hereinafter, the "Financial Statement") on or before sixty (60) days before sentencing and will provide a copy to Trial Attorney Andrew Estes. The defendant agrees that a failure to disclose all assets on the Financial Statement and to inform the government in writing of any material changes up until the time of sentencing constitutes a material breach of this agreement. Upon such a breach, the defendant will not be entitled to withdraw the plea, but the Office may bring additional criminal charges against the defendant. Should undisclosed assets which the defendant owns or in which the defendant has an interest be discovered, the defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of said assets and agrees that said assets shall be forfeited to the United States pursuant to 18 U.S.C. §§ 982(a)(1) and 982(b)(1) and 21 U.S.C. § 853(p), as property, real or personal, involved in his violation of 18 U.S.C. § 1956(h), or any property traceable to such property and/or substitute assets.

12.    The defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of any monies and/or properties forfeited hereunder, including

7

notice set forth in an indictment, information or administrative notice.  In addition, the defendant knowingly and voluntarily waives his right, if any, to a jury trial on the entry of a Forfeiture Money Judgment, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and/or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto clause of the Constitution, any applicable statute of limitations, venue, or any defense under the Eighth Amendment, including a claim of excessive fines.

13.    The defendant agrees that the entry and payment of the Forfeiture Money Judgment are not to be considered a payment of a fine, penalty, restitution loss amount, or any income taxes that may be due, and shall survive bankruptcy.

14.    The defendant understands and acknowledges that the defendant will be excluded as a provider from Medicare, Medicaid and all federal health care programs.  The defendant agrees to complete and execute all necessary documents provided by any department or agency of the federal government, including but not limited to the United States Department of Health and Human Services, to effectuate this exclusion within 60 days of receiving the documents.  This exclusion will not affect the defendant's right to apply for and receive benefits as a beneficiary under any federal health care program, including Medicare and Medicaid.

15.    The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is a naturalized citizen of the United States.  Under federal law, an individual may be subject to denaturalization and removal if her naturalization was procured by concealment of a material fact or by willful misrepresentation or otherwise illegally procured.  Denaturalization and other immigration consequences are typically the subject of a separate proceeding, however, and the defendant

understands that no one, including the defendant's attorney or the Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration status.  The defendant nevertheless affirms that the defendant wants to plead guilty regardless of any immigration consequences that the defendant's plea may entail, even if the consequence is the defendant's denaturalization and automatic removal from the United States.

16.     This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

17.     Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement supersedes all prior

promises, agreements or conditions between the parties.  To become effective, this agreement

must be signed by all signatories listed below.

Dated: Brooklyn, New York

November 5, 2022

BREON PEACE
United States Attorney
Eastern District of New York

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

By: _____
Andrew Estes
Trial Attorney

Approved by:

_____
Miriam Glaser Dauermann
Acting Assistant Chief
Criminal Division, Fraud Section
U.S. Department of Justice

_____
Drew G. Rolle
Deputy Chief, Business and Securities Fraud
United States Attorney's Office
Eastern District of New York

I have read the entire agreement and discussed it with my attorney. I understand all of its terms
and am entering into it knowingly and voluntarily.

_____
PETER KHAIM
Defendant

Approved by:

_____
James Froccaro, Esq.
Counsel to Defendant

10